776 F.2d 1143
 54 USLW 2300, 11 Soc.Sec.Rep.Ser. 242,
Unempl.Ins.Rep. CCH 16,404
 Angel LUGO and Maria Luna, by her guardian ad litem Angel
Lugo, on behalf of themselves and on behalf of all others
similarly situated, Sarah M. Pickels, on behalf of Edward
Pickels, and Edward F. Terebieniec, individually and on
behalf of all other similarly situated, Intervenors,
v.
Richard S. SCHWEIKER, Secretary, U.S. Department of Health
and Human Services, Appellant.
 No. 85-1066.
 United States Court of Appeals,
Third Circuit.
 Argued Aug. 14, 1985.
Decided Nov. 13, 1985.
 
 Edward S.G. Dennis, Jr., U.S. Atty., Philadelphia, Pa., Richard K. Willard, Acting Asst. Atty. Gen., William Kanter, Michael Kimmel (argued), Attys., Appellate Staff, Dept. of Justice, Washington, D.C., for appellant.
 Henry J. Sommer (Argued), David L. Hill, Community Legal Services, Inc., Philadelphia, Pa., for appellees.
 Before ADAMS, GIBBONS and WEIS, Circuit Judges.
 OPINION OF THE COURT
 ADAMS, Circuit Judge.
 
 
 1
 This class action involves a challenge to certain regulations employed by the Social Security Administration (SSA) when it determines that incorrect sums of money were disbursed to beneficiaries. The challenged regulations provide that where SSA ascertains that a beneficiary was both underpaid and overpaid at various times in the past, the agency may "net" the amounts to determine a single adjusted overpayment or underpayment. Plaintiffs argue that this procedure undercuts the rule of Califano v. Yamasaki, 442 U.S. 682, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979). Yamasaki held that the Social Security Act entitles a recipient to a hearing before SSA may recover an overpayment, to decide whether the recovery should be waived in the interest of equity and good conscience. Plaintiffs insist that the netting practice, by offsetting overpayments with underpayments owed to the beneficiaries, forecloses their opportunity to seek waiver of each monthly overpayment.
 
 
 2
 The district court agreed with the plaintiffs, and held that the Secretary's netting regulations are inconsistent with the Act and therefore impermissible; it ordered expansive class relief. However, given the broad discretion confided to the Secretary to promulgate regulations, we disagree, and will direct that the district court's award of summary judgment to the plaintiffs be vacated and that summary judgment be entered in favor of the defendant.
 
 I.
 
 3
 The impact of the netting regulations on the members of the plaintiff class may be demonstrated by the facts presented by the original plaintiff, Angel Lugo. Lugo became eligible for Supplemental Security Income (SSI) benefits on January 1, 1974; in 1977, the Secretary determined that he was no longer disabled and terminated his benefits. Following a series of appeals, the Secretary found on August 17, 1980, that Lugo actually had been eligible for SSI benefits since November 17, 1976. The underpayment owed Lugo for the 1977-1980 period was calculated at $2,798.70. At the same time, however, SSA calculated that he was overpaid $6,100.60 from 1974 to 1976.
 
 
 4
 Pursuant to 20 C.F.R. Sec. 416.538 (1981), the Secretary deducted the amount underpaid from the amount overpaid and informed Lugo that he had received an adjusted overpayment of $3,301.90. The Secretary further decided, in accordance with 42 U.S.C. Sec. 1383(b)(1)(A) (1976), that Lugo was without fault in receiving these excess funds and that recovery by the government against him would be inequitable. Accordingly, the $3,301.90 overpayment that had been made to Lugo was waived.
 
 
 5
 On July 13, 1981, Lugo filed a request that SSA waive repayment of the entire $6,100.60 overpayment. He also asked the agency to repay him immediately the $2,798.70 he had been underpaid. SSA denied these requests, in a Notice of Reconsideration mailed on August 19, 1981.
 
 
 6
 Lugo then instituted this civil action on September 21, 1981.[1] The district court later permitted other plaintiffs to intervene. All of the claims involved past overpayments and underpayments which resulted in a net overpayment to each of the claimants. The district court also permitted the named plaintiffs to represent a class consisting of all persons who:
 
 
 7
 (1) have been, are, or will be served by the Philadelphia regional office of the United States Department of Health and Human Services;
 
 
 8
 (2) have been or will be determined eligible for social security or SSI benefits;
 
 
 9
 (3) have been or will be entitled to payment of benefits due for prior months;
 
 
 10
 (4) have had or will have all or part of retroactive benefits withheld from prompt payment or adjusted by defendant in order to recoup previous overpayment of benefits without receiving notice and an opportunity for a hearing on the issue of waiver of said recoupment or adjustment prior to such withholding or adjusting by defendant; and,
 
 
 11
 (5) have made or will make a claim to defendant requesting the release of benefits withheld or adjusted. The class includes all persons who received notice of the adjusted/recouped amount of benefits within the four years prior to September 21, 1981, the date this action was commenced. The class does not include any person as to whom a court has already rendered a decision on the issues presented in this case.
 
 
 12
 Lugo v. Schweiker, 599 F.Supp. 948, 950-51 (E.D.Pa.1984). The Philadelphia regional office serves recipients in Delaware, Maryland, Pennsylvania, Virginia, West Virginia, and the District of Columbia, overseeing the cases of approximately 10% of the nation's 39,000,000 Social Security beneficiaries.
 
 
 13
 Lugo's amended complaint asserted that the Secretary's netting regulations are at odds with legislative authority, and also violate due process. The district court accepted the statutory argument, and granted the plaintiffs' motion for summary judgment. Further, the district court enjoined the Secretary from employing the netting procedure in the Philadelphia regional office, ordered the Secretary to provide a hearing before recoupment of Social Security or SSI overpayments by any means, and directed the Secretary to disburse to all class members the amount of withheld underpayments regardless of any overpayments. Lugo, 599 F.Supp. at 952-53.
 
 
 14
 The Secretary filed a timely appeal, and on May 7, 1985, a panel of this Court entered a stay of the district court's judgment pending appeal.
 
 II.
 
 15
 Plaintiffs invoked the district court's jurisdiction under the judicial review provisions of the Social Security Act, 42 U.S.C. Secs. 405(g), 1383(c)(3) (1982), as well as the district court's mandamus jurisdiction, 28 U.S.C. Sec. 1361 (1982). The Secretary challenges this assertion of jurisdiction with respect to members of the class who failed to file timely administrative and civil actions in their individual cases, arguing that Sec. 405(g) requires such procedures as a prerequisite to judicial review. See also Yamasaki, 442 U.S. at 701, 99 S.Ct. at 2557. The Secretary also disputes the district court's mandamus jurisdiction, but without explanation of her reasoning.
 
 
 16
 Given our disposition of the merits, we need not address the factors a court must consider in assessing the appropriateness of district court jurisdiction over particular class members in Social Security litigation. Cf. Heckler v. Ringer, 466 U.S. 602, 104 S.Ct. 2013, 80 L.Ed.2d 622 (1984); Mathews v. Eldridge, 424 U.S. 319, 326-32, 96 S.Ct. 893, 898-901, 47 L.Ed.2d 18 (1976); Weinberger v. Salfi, 422 U.S. 749, 756-67, 95 S.Ct. 2457, 2462-67, 45 L.Ed.2d 522 (1975); Liberty Alliance of the Blind v. Califano, 568 F.2d 333, 343-47 (3d Cir.1977).[2] For the purpose of this Court's review of the district court's decision, it is sufficient that the district court had jurisdiction at least over the named plaintiffs, who filed administrative complaints, received adverse decisions, and then filed timely civil actions in accordance with Sec. 405(g). This Court has jurisdiction to review a final district court decision, under 28 U.S.C. Sec. 1291 (1982).
 
 III.
 A.
 
 17
 Turning to the merits, it is important to stress the limited scope of judicial review of administrative regulations such as those at issue in this appeal. In Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), the Supreme Court recently outlined the applicable principles of administrative law:
 
 
 18
 When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.
 
 
 19
 ... If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute. Sometimes the legislative delegation to an agency on a particular question is implicit rather than explicit. In such a case, a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency.
 
 
 20
 Id., 104 S.Ct. at 2781-82 (footnotes omitted).
 
 
 21
 The central question in the present appeal is the proper interpretation of the statutes governing correction of erroneous payments. The relevant portion of 42 U.S.C. Sec. 404(a) (1982), applicable to insured Social Security beneficiaries, provides:
 
 
 22
 Wherever the Secretary finds that more or less than the correct amount of payment has been made to any person under this subchapter, proper adjustment or recovery shall be made, under regulations prescribed by the Secretary....
 
 
 23
 The analogous SSI provision, 42 U.S.C. Sec. 1383(b)(1) (West Supp.1985), contains similar language.[3]
 
 
 24
 In construing these provisions, plaintiffs contend that the Secretary must consider each month separately and compile a separate list of overpayments and underpayments and afford a hearing or hearings as to each erroneous disbursement. In contrast, the Secretary argues that she may group all incorrect payments--underpayments as well as overpayments--in calculating the net effect of erroneous payments. But on this particular question, the statutes are silent.
 
 
 25
 Because Congress decided not to describe explicitly the method for computing erroneous payments, we must defer to the Secretary's interpretation so long as it is reasonable. Indeed, the Secretary is entitled to more than mere discretion in the context here, because both Sec. 404(a) and Sec. 1383(b)(1) expressly authorize her to determine whether "more or less than the correct amount of payment has been made." Further, Sec. 405(a) and the SSI provision in Sec. 1383(d)(1) grant the Secretary "full power and authority to make rules and regulations and to establish procedures, not inconsistent with the provisions of this subchapter, which are necessary or appropriate to carry out such provisions...." This broad grant of authority permits SSA to issue "legislative regulations," which a court may not disturb "unless they are arbitrary, capricious, or manifestly contrary to the statute." Chevron, 104 S.Ct. at 2782; see also Heckler v. Campbell, 461 U.S. 458, 466, 103 S.Ct. 1952, 1957, 76 L.Ed.2d 66 (1983); Schweiker v. Gray Panthers, 453 U.S. 34, 43-44, 101 S.Ct. 2633, 2640, 69 L.Ed.2d 460 (1981); Batterton v. Francis, 432 U.S. 416, 424-26, 97 S.Ct. 2399, 2404-06, 53 L.Ed.2d 448 (1977); Beatty v. Schweiker, 678 F.2d 359, 360 (3d Cir.1982).
 
 
 26
 The dissent agrees with the plaintiffs that the description contained elsewhere in the statutes regarding Social Security benefits as monthly entitlements compels the conclusion that erroneous payments should also be calculated monthly. But while the statutes governing entitlement to benefits refer specifically to monthly periods, significantly the provisions concerning erroneous payments contain no such limitation. There is no indication that Congress intended to incorporate in the latter statutes the other reference to monthly periods.[4] In such a situation, this Court must defer to the Secretary's reasonable interpretation. The dissent appears to ignore this basic principle of administrative law and statutory construction.
 
 B.
 
 27
 Pursuant to the statutory authority, the Secretary issued regulations describing how she calculates overpayments and underpayments,[5] and in particular how she proceeds when both types of error are present in a claimant's record. The relevant SSI regulation provides:
 
 
 28
 The amount of an underpayment or overpayment is the difference between the amount paid to a recipient for a period and the amount of payments for which such recipient actually was eligible for such period. The period with respect to a determination of the fact or amount of any overpayment or underpayment begins with the first month of any quarter for which there is a difference between the amount paid and the amount due and ends with the month immediately preceding the calendar quarter in which the initial determination of overpayment or underpayment is made except that the period for an overpayment originally detected in 1974 shall not end later than December 31, 1974.
 
 
 29
 20 C.F.R. Sec. 416.538 (1985). The regulation applicable to insured beneficiaries, Sec. 404.504, is somewhat ambiguous:
 
 
 30
 The amount of an overpayment or underpayment is the difference between the amount paid to the beneficiary and the amount of the payment to which the beneficiary was actually entitled.
 
 
 31
 However, the Secretary has announced that in applying Sec. 404.504 she uses the same comparison of overpayments and underpayments within a prescribed period that is detailed in Sec. 416.538. See SSR 81-19a.
 
 
 32
 We cannot say that the Secretary's netting procedure is an arbitrary or capricious method of making the calculation required by Congress. SSA's decision to net all errors--both underages and overages--and then inform the claimant of the single differential is reasonable from an administrative point of view, in that SSA can thereby avoid a multitude of confused notices and hearings. Those entrusted with the administration of the complex Social Security programs are entitled to make such choices.C.
 
 
 33
 Plaintiffs argue, however, that the Secretary's practice nullifies their opportunity to seek waiver of overpayments at a prerecoupment hearing. The district court agreed, and held that SSA's accounting procedure is "a recoupment without opportunity for the recipient to seek a waiver of the full [overpayment] amount." 599 F.Supp. at 952. Accord Tarver v. Harris, No. C79-1554A (N.D.Ga.1980).[6] Congress permits such waiver in limited circumstances, see 42 U.S.C. Secs. 404(b), 1383(b)(1)(A), and in Yamasaki the Supreme Court construed Sec. 404(b) to require an oral hearing before the Secretary may proceed to recoup overpayments. The netting procedure employed by the Secretary, according to the plaintiffs, allows SSA to recoup overpayments from other payments owed to the beneficiary and thus to evade the waiver and hearing provisions.
 
 
 34
 This contention misapprehends the Sec. 404 scheme, as well as the Yamasaki decision. Section 404(a) compels the Secretary to make a finding concerning the erroneous payments at issue; only afterwards does Sec. 404(b) provide a hearing and an opportunity for waiver should SSA find that an overpayment occurred.[7] In Yamasaki, the Court recognized this distinction. While it required a hearing for determination of imprecise Sec. 404(b) standards such as "fault," it noted that disputes may arise over the Sec. 404(a) calculation of overpayment but there need be no hearing to resolve them. The Supreme Court declared, "The statute authorizes only 'proper' recoupment, but some leeway for practical administration must be allowed." 442 U.S. at 696, 99 S.Ct. at 2555.
 
 
 35
 Plaintiffs argue additionally that Yamasaki supports their claim, since one of the named plaintiffs in that case sought a hearing concerning all overpayments even though she had incurred an offsetting underpayment. These facts, however, appear only in the Secretary's brief, Petitioner's Brief at 11 n. 15, Califano v. Yamasaki, 442 U.S. 682, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979), and the parties did not otherwise address nor did the Court mention the implications of netting. Nevertheless, the plaintiffs here claim that the Court's decision is controlling as to the facts before it, citing NAACP v. Medical Center, Inc., 657 F.2d 1322 (3d Cir.1981) (in banc). Medical Center, however, contains no such interpretational maxim, as it merely sought to construe Supreme Court decisions and focused on the special facts which the Court faced and addressed in those cases. Id. at 1329-30. The import of the unacknowledged facts in Yamasaki is better analogized to the slim precedential value of summary affirmances by the Supreme Court when relied upon in later cases. See Edelman v. Jordan, 415 U.S. 651, 671, 94 S.Ct. 1347, 1359, 39 L.Ed.2d 662 (1974). Accordingly, we decline to base a decision of an issue of administrative law upon the fact that the Supreme Court did not address a footnote in a party's brief in an earlier case.
 
 D.
 
 36
 Plaintiffs appear to be concerned by a sense that Social Security beneficiaries in their class are being treated differently--and less favorably--than those recipients whose cases involve an underpayment or an overpayment but not both. As they view the statutory scheme, claimants may seek waiver of any overpayment and thus secure extra benefits, unless they are unfortunate enough to have been underpaid during the same period. Even if this view were persuasive, a court may undo such an alleged discrimination only if it is at odds with the Act.
 
 
 37
 They observe that "[t]he overall objective of the social security system is 'the protection of its beneficiaries from some of the hardships of existence.' " Finberg v. Sullivan, 634 F.2d 50, 63 (3d Cir.1980) (in banc) (quoting United States v. Silk, 331 U.S. 704, 711, 67 S.Ct. 1463, 1467, 91 L.Ed. 1757 (1947)). And thus, the proper focus of those interpreting the Act is to ensure that present benefits provide the necessary means for subsistence. See Beatty v. Schweiker, 678 F.2d 359, 362 (3d Cir.1982). But the waiver provisions applicable to overpayments embody this principle, by requiring the Secretary to forego recoupment of sums owed by the beneficiary where such a recoupment would reduce the individual's future benefits below an acceptable level.
 
 
 38
 While Congress provided for deserving beneficiaries in some cases to receive more than their entitlements, by permitting SSA to waive such overpayments, it does not follow that any time a recipient is overpaid he or she will necessarily be entitled to seek a windfall. Where the recipient was also underpaid, it is logical to offset the amounts. By such an interpretation, the parties are placed in the position that the law intended, and Congress' generous provision of waiver of overpayment remains the exception rather than the rule.
 
 
 39
 Plaintiffs maintain that one who is both underpaid and overpaid is actually in a worse position than all other claimants. This is true, they assert, because any time a recipient is underpaid he is likely to accumulate debts. Normally, this does not create hardship since once the underpayment is discovered the individual receives a lump-sum payment with which to pay liabilities. But if one is also overpaid, and cannot seek waiver of every monthly overpayment, after netting he will not receive the full lump-sum payment. Thus, while the primary goal of the Act, to provide adequate present benefits, may be fulfilled in theory as soon as the errors are discovered, those benefits, plaintiffs argue, may actually be inadequate given the individual's large and pressing debts.
 
 
 40
 We are somewhat troubled by this scenario, granting that it is the worst possible case, but concern for a particularized situation is not grounds for voiding a regulation designed to deal with thousands of cases. As federal judges, we must leave the determination of policy to those with legislative authority. Chevron, supra, 104 S.Ct. at 2793. It is sufficient that, in numerous cases, erroneous payments are minor in amount and in duration, and the offset treats both parties equitably.[8] Consequently, in allowing waiver of net overpayments and maintenance of current benefits, the netting regulations are consonant with the goals of the Act. In a social welfare case we must recognize the "limitations on the practical ability of the State to remedy every ill." Plyler v. Doe, 457 U.S. 202, 216, 102 S.Ct. 2382, 2394, 72 L.Ed.2d 786 (1982).[9]
 
 
 41
 Plaintiffs' last contention is that the result reached today will create an incentive for SSA to delay notifying claimants of erroneous payments, in the hope that later mistakes will offset the earlier errors and ease the administrative burden of correcting them. This theory is flawed, however. Where SSA knows of an underpayment, it makes no difference to it whether an immediate disbursement is made or the beneficiary is later overpaid. If it knows of an overpayment, it is in the interest of SSA to notify the individual immediately, as numerous errors are small and many recipients will not request waivers or hearings. In any event, a beneficiary who knows of an error may seek immediate redress, and if necessary file an administrative complaint and ultimately a civil action.
 
 
 42
 In summary, the Secretary's netting regulations are not arbitrary and capricious, but in fact are a reasonable means to accomplish the statutory mandate. They are consistent with the Act's broad purposes, and must be upheld.
 
 IV.
 
 43
 The district court did not reach the plaintiffs' constitutional arguments, properly following the rule that, where possible, cases should be decided on statutory grounds. See, e.g., Yamasaki, 442 U.S. at 692, 99 S.Ct. at 2553. Because of our decision supporting the Secretary's statutory argument it is necessary that we address plaintiffs' claim that the statutes regarding the calculation and recoupment of erroneous benefit determinations, as construed by the Secretary, violate equal protection, due process, and "substantive due process." We conclude that these claims are lacking in merit.
 
 A.
 
 44
 Plaintiffs' first constitutional claim rests on the equal protection component of the Fifth Amendment's due process clause. See Schweiker v. Wilson, 450 U.S. 221, 226 & n. 6, 101 S.Ct. 1074, 1079 & n. 6, 67 L.Ed.2d 186 (1981). In Social Security litigation, a challenged classification will pass constitutional muster if it "advances legitimate legislative goals in a rational fashion." Id. at 234, 101 S.Ct. at 1082.
 
 
 45
 The classification challenged on this appeal is not only rational but clearly necessary. A case in which a beneficiary is overpaid, for example, $100, is quite different from one in which the Secretary discovers an overpayment of $100 and an underpayment of $50. In the latter situation, the claimant rightly owes SSA only $50, and SSA properly establishes this before the waiver procedure begins. In short, no two cases of erroneous determinations are alike, and Congress rationally gave the Secretary authority to make a threshold determination in each situation as to the exact overpayment amount subject to waiver. Administration of individualized benefits calculations in such a case-by-case fashion is a legitimate and proper legislative goal.
 
 
 46
 Plaintiffs insist that they are discriminated against since they, unlike others, may not seek waiver at a hearing of each monthly overpayment. But this argument rests on plaintiffs' conception of an overpayment as a discrete error in one month. The Secretary, pursuant to statutory authority, takes a larger view of an overpayment as the net result of all errors in a period. Nothing in the Fifth Amendment prevents such a rational administrative interpretation.
 
 B.
 
 47
 Next, plaintiffs assert that the regulations abridge their due process rights. If they were correct that Sec. 404 and its companion SSI provision require an opportunity for waiver of any overpayment, regardless of an offsetting underpayment, discussion of their due process contention would be unnecessary: Yamasaki requires that evidentiary hearings be conducted prior to determinations of waiver of recoupment if a recipient so requests. However, the netting procedure, as construed by the Secretary pursuant to a Congressional grant of authority, is a valid method of establishing the amount of the overpayment that may be waived. As such, the Secretary is not required by due process considerations to provide a hearing when employing the netting regulations.
 
 
 48
 The latter result is also supported by Yamasaki. There, the Supreme Court held that the Secretary need not provide a hearing at which beneficiaries may present evidence relevant to overpayment computations. Because any issue in dispute is likely to involve only mathematical determinations, a claimant's right to submit written evidence satisfies whatever process is due. 442 U.S. at 696, 99 S.Ct. at 2555. Such determinations are not of the character that would be clarified by oral testimony and examination of witnesses. Id.; Mattern v. Mathews, 582 F.2d 248, 256 (3d Cir.1978), cert. denied, 443 U.S. 912, 99 S.Ct. 3101, 61 L.Ed.2d 876 (1979); Griffin v. Califano, 448 F.Supp. 430 (N.D.Ga.1977), aff'd mem., 608 F.2d 1371 (5th Cir.1979).
 
 C.
 
 49
 Finally, plaintiffs urge that the Secretary's regulations are "totally arbitrary and irrational," and therefore violate "substantive due process," citing United States Dep't of Agriculture v. Murry, 413 U.S. 508, 93 S.Ct. 2832, 37 L.Ed.2d 767 (1973).
 
 
 50
 In Murry, the Court held unconstitutional a statute that denied food stamp benefits to a household if any of its members was claimed by a non-member as a dependent child in the previous income tax year. Justice Douglas wrote that this scheme was irrational and therefore "lacks critical ingredients of due process." Id. at 514, 93 S.Ct. at 2836.
 
 
 51
 Read broadly, Murry and similar decisions from the early 1970's may be viewed as establishing expansive judicial review of legislative action. But in surveying these cases in Malmed v. Thornburgh, 621 F.2d 565 (3d Cir.), cert. denied, 449 U.S. 955, 101 S.Ct. 361, 66 L.Ed.2d 219 (1980), this Court refused to perceive such a radical trend. Rather, Judge Aldisert wrote, the cases merely reaffirm the rational basis test and the limited judicial review it provides in cases arising under the Fifth and Fourteenth Amendments. Id. at 575.
 
 
 52
 Accordingly, the analysis of this matter in light of Murry is similar to our earlier discussion of the equal protection issue, and the plaintiffs' argument in this respect must fall.
 
 V.
 
 53
 The Social Security system aims to provide eligible individuals with all amounts for which they are properly eligible, and other benefits necessary to maintain an adequate standard of living. These goals are laudable, but their accomplishment is extremely complicated when applied in millions of cases. Errors are unfortunate, and in some cases inevitable.
 
 
 54
 In our view, the procedures devised by Congress and the Secretary represent a reasonable attempt to correct such errors, are congruent with the Act's goals, and meet constitutional strictures. The district court's order of summary judgment for the plaintiffs will therefore be vacated, and summary judgment entered in favor of the Secretary.
 
 GIBBONS, Circuit Judge, dissenting:
 
 55
 Two federal entitlement programs are involved in this appeal; Federal Old-Age, Survivors, and Disability Insurance Benefits, authorized by Title II of the Social Security Act, 42 U.S.C. Secs. 401-433 (1982), and Supplemental Security Income for Aged, Blind and Disabled, authorized by Title XVI, 42 U.S.C. Secs. 1381-1385 (1982). The starting point for consideration of the validity of the challenged "netting" regulations adopted by the Secretary for resolution of overpayment disputes is the statutory definition of the respective entitlements. Both programs provide for entitlement to monthly benefits.[1] Thus the very nature of the entitlements establishes the basic statutory accounting period.
 
 
 56
 The instant problem arises, however, out of two provisions authorizing the Secretary to take steps to recover overpayments of monthly benefits. Title II provides that
 
 
 57
 [w]henever the Secretary finds that more or less than the correct amount of payment has been made.... proper adjustment or recovery shall be made, under regulations prescribed by the Secretary as follows:
 
 
 58
 (1) With respect to payment ... of more than the correct amount, the Secretary shall decrease any payment under this subchapter ... or shall require such overpaid person or his estate to refund the amount in excess of the correct amount ... or shall apply any combination of the foregoing.
 
 
 59
 (2) With respect to payment to a person of less than the correct amount, the Secretary shall make payment of the balance of the amount due such underpaid person.
 
 
 60
 42 U.S.C. Sec. 404(a). The plain meaning of this section is that all excess monthly benefit payments shall be recovered by the United States, and all underpayments of monthly benefits shall be paid by the United States. A provision in Title XVI is similarly mandatory.[2] The mandatory direction to the Secretary in both Titles that underpayments of monthly benefits shall be paid by the United States is unqualified. With respect to overpayment of monthly benefits, however, the otherwise mandatory requirement that they be recovered is qualified. Title II provides that notwithstanding the provision authorizing recovery of overpaid monthly benefits, "there shall be no adjustment of payments to, or recovery by the United States from, any person who is without fault if such adjustment or recovery would defeat the purpose of this subchapter or would be against equity and good conscience." 42 U.S.C. Sec. 404(b). Title XVI contains a similar qualification of the statutory right of the United States to recover excess monthly benefits.[3] Significantly, the qualification of the United States' right is not merely of the right to setoff against future monthly benefits, but of the right to recover at all. The qualification applies both to adjustments and to recoveries.
 
 
 61
 In contrast, however, there is no qualification in either Title of the Secretary's obligation to pay monthly benefits which have been withheld or underpaid. The difference in treatment of overpayments and underpayments is quite plain. It is consistent with the fundamental policy motivating Congress in enacting both Titles; namely assuring those most in need in our society that they will receive a monthly benefit which will from month to month provide for the necessities of life.
 
 
 62
 The waiver of recovery provisions, applicable only to overpayments of monthly benefits, present no particular problem in instances where the United States attempts recovery by means other than self-help. In a suit to recover overpayments, for example, the waiver issue can be presented and determined before a judgment is entered. But when the Secretary determines that recovery shall be accomplished by the self-help device of reducing future benefits--a method authorized in both Titles--the possibility arises that those entitled to monthly benefits will be deprived of those benefits without due regard for the waiver standards. Recognizing that such a result would be inconsistent with the Congressional qualification upon the government's right to recover, the Supreme Court in Califano v. Yamasaki, 442 U.S. 682, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979) interpreted 42 U.S.C. Sec. 404(b) as requiring the government to give beneficiaries notice and a hearing on the waiver question before seeking to recover overpaid benefits from them. The reason for this requirement lies in the plain language of the statute. Thus, in Yamasaki, the Court noted, "In contrast [with other federal statutes authorizing waiver of recovery] Sec. 204 [Sec. 404] is mandatory in form. It says 'there shall be no' recovery when waiver is proper." 442 U.S. at 694 n. 9, 99 S.Ct. at 2554 n. 9. No recovery means no recovery by setoff, and no recovery by suit; no recovery at all.[4]
 
 
 63
 Both the language of the waiver of recovery provisions and the Supreme Court's interpretation of these provisions could not be plainer. The United States may not recover overpayments in any manner until an opportunity has been afforded for a waiver hearing. Despite the plain language of the statutes, and the Yamasaki opinion, however, the Secretary has devised an ingenious scheme whereby "no recovery" becomes "some recovery." The chosen devices are the two "netting" regulations quoted in the majority opinion. The key to the netting regulations is the Secretary's completely artificial definition of the period for calculation of overpayments and underpayments. The statutory entitlements are monthly benefits. In calculating net overpayments or underpayments, however, the Secretary has chosen to disregard the fact that the overpayment provisions refer to such monthly benefits. Instead the Secretary has devised an entirely different period of measurement:
 
 
 64
 The period with respect to a determination of the fact or amount of any overpayment or underpayment begins with the first month of any quarter for which there is a difference between the amount paid and the amount due and ends with the month immediately preceding the calendar quarter in which the initial determination of overpayment or underpayment is made....
 
 
 65
 20 C.F.R. Sec. 416.538 (1985).
 
 
 66
 The effect of this quaint regulation is that the period for calculating overpayments or underpayments is completely open-ended. It can involve recapture of overpayments made even a quarter century ago. More significant for this appeal, however, is the fact that the netting regulations permit the Secretary to accomplish what the waiver provisions plainly and unequivocally forbid; namely a recovery by the United States of overpayments without a hearing on waiver.[5]
 
 
 67
 The Secretary insists that her ingenious device for obtaining some repayments without a waiver hearing is a fair means for avoiding windfalls to beneficiaries. So it is. It is a device for avoiding windfalls, however, for which Congress made express provision. The majority attempts to justify the Secretary's position with the observation that "[a]s federal judges, we must leave the determination of policy to those with legislative authority." At 1150. The legislative determination was made in this case by Congress, when it determined that no recovery of an overpayment of a monthly benefit would be permitted in the absence of a waiver determination.
 
 
 68
 The attempt by the Secretary and the majority to conceal the fact that the case involves recovery of overpayments is unrealistic and unpersuasive. The scenario in the case of Angel Lugo serves to demonstrate just how unrealistic the attempt is. Lugo began receiving disability benefits under Title II in 1974. In October 1977 he was exposed to the practice, with which members of this court are all too familiar, of being purged from the disability benefits rolls. He pursued his claim, obtaining a final decision from the Secretary on March 17, 1980 that he met the disability requirements as of November 17, 1976. Thus, Lugo was entitled to the payment of monthly benefits from November 17, 1976 forward--underpayments totaling $2,798.70. Despite the mandatory language of 42 U.S.C. Sec. 402(a)(2), he was not paid these benefits. Instead the Secretary informed Lugo that between 1974 and October 1976 he had been overpaid $6,100.60 and that the "net" overpayment was $3301.90. Since under 42 U.S.C. Sec. 404(b) the Secretary could not, without a waiver hearing, seek to recover the $3,301.90, Lugo was informed he could seek a waiver hearing with respect to that amount. But the unadorned economic reality is that by delaying the processing of Lugo's disability claim and applying the netting regulation, the Secretary did obtain a recovery of $2,798.70. Under section 404(b), the United States was not entitled, without a waiver hearing, to recover either the $3,301.90 or the $2,798.70. It was entitled to no recovery. Had the Secretary been able to drag out the processing of Lugo's claim for more than the thirty months which that processing took, she would have obtained, despite the statutory prohibition, an even higher recovery. The less than satisfactory experience of this court with respect to the Secretary's processing of disability claims suggests that the scenario in Lugo's case, and in Pickel's case, in which $2,208.90 was recovered, will occur with some frequency. The frequency or infrequency of the occurrence is not, of course, dispositive. What is dispositive is the Congressional decision that no recovery of overpaid monthly benefits paid pursuant to Title II and Title XVI may be obtained by the United States until after a waiver hearing.
 
 
 69
 The majority has justified an end run by the Secretary around both the waiver statutes and the Supreme Court's decision in Califano v. Yamasaki, supra. Because the district court opinion, Lugo v. Schweiker, 599 F.Supp. 948 (E.D.Pa.1984), recognizes that the netting regulation is inconsistent with the waiver statutes and Supreme Court precedent. I would affirm.
 
 
 
 [1]
 Early in the proceedings, the district court remanded the case at the request of the Secretary for further clarification of the disputed amounts. The computation was complicated because Lugo also received SSI benefits as representative payee for his common law wife, Maria Luna, another named plaintiff in this action. Subsequently, SSA modified its conclusion regarding both claimants in minor respects, and Lugo's action was reinstated on September 29, 1982
 
 
 [2]
 The Supreme Court agreed recently to consider a case that addressed this issue. City of New York v. Heckler, 742 F.2d 729 (2d Cir.1984), cert. granted, --- U.S. ----, 106 S.Ct. 57, 88 L.Ed.2d 46 (1985)
 
 
 [3]
 The statute states in relevant part:
 Whenever the Secretary finds that more or less than the correct amount of benefits has been paid with respect to any individual, proper adjustment or recovery shall, subject to the succeeding provisions of this subsection, be made by appropriate adjustments in future payments to such individual or by recovery from or payment to such individual or his eligible spouse (or by recovery from the estate of either).
 
 
 [4]
 Plaintiffs seek support in the legislative history of Sec. 404(b), in which the Senate Committee wrote that the statute "waives any right of the United States to recover by legal action or otherwise in any case of incorrect payment to an individual if adjustment or recovery would defeat the purpose of this title or would be against equity and good conscience." Appellees' Br. at 16 (quoting S.Rep. No. 734, 76th Cong., 1st Sess. 51 (1939) (emphasis added)). This language is as enigmatic as the statutory provision with respect to netting overpayments and underpayments, and is thus subject to divergent interpretations
 
 
 [5]
 According to the Secretary, overpayments are typically caused by inaccurate assessments of future income, unreported excess income, reductions of disability benefits through receipt of worker's compensation benefits, retroactive changes in the law, incorrect entitlement determinations, and other recipient and administrative errors. Underpayments are commonly the result of errors in calculating benefit payments, unpaid accrued benefits, erroneous terminations, and unnegotiated or lost checks. Appellant's Br. at 5 n. 3
 
 
 [6]
 Tarver held that the Secretary may not recoup overpayments from lump-sum benefits owed to claimants without affording a hearing. Here, the Secretary attempts to distinguish Tarver, arguing that that case involved recoupment of overpayments from underpayments that were from a different period and already adjudicated
 
 
 [7]
 Section 404(b) provides:
 In any case in which more than the correct amount of payment has been made, there shall be no adjustment of payments to, or recovery by the United States from, any person who is without fault if such adjustment or recovery would defeat the purpose of this subchapter or would be against equity and good conscience.
 42 U.S.C. Sec. 404(b) (1982).
 The plaintiffs further insist that the language in this subsection, that "there shall be no adjustment of payments," refers to deprivation of lump-sum payments owed to the beneficiary as well as reduction of future benefit payments. However, this subsection does not come into operation until the Sec. 404(a) offset is determined. Further, the plaintiffs' argument once again rests on ambiguous language, and we must defer to the Secretary's reasonable view that "adjustment of payments" refers to future benefit disbursements.
 
 
 [8]
 The hardship described above is likely only where the overpayments and underpayments occur at widely different times within a period (e.g., in separate years), and where the overpayments occur first. Lugo's case is an example of this somewhat unusual situation. There, the overpayment occurred first, and if it had been discovered promptly Lugo could have sought waiver of the entire overpayment. But the longer the error went uncorrected the more likely it became that Lugo had spent all the funds. Then, the long underpayment began and debts could accumulate. When the netting finally occurred, the beneficiary did not receive a full lump-sum benefit, since the underpayment was offset against the overpayment, and he cannot seek waiver of every individual overpayment
 While Lugo's circumstances are cause for concern, the Secretary's actions may not be measured against their impact in one of the thousands of cases she must administer. Tustin v. Heckler, 749 F.2d 1055, 1064 (3d Cir.1984). Lugo's situation was worsened because his underpayment was quite large and continued over a four-year period. The cases of the other named plaintiffs provide a ready contrast. Luna's underpayment was only $215.90, and was offset by an identical overpayment; Terebieniec's underpayment was merely $126.30, in contrast to his $966.90 overpayment. Pickel's case provides more severe errors--a $2,208.90 underpayment and $3,489.00 overpayment. But the mistakes in the Pickel case accrued in little more than a year.
 
 
 [9]
 This conclusion is consistent with our decision in Beatty v. Schweiker, 678 F.2d 359 (3d Cir.1982). In that case, the Secretary granted SSI benefits four years after the application was filed, and disbursed $11,500 in retroactive benefits. Because of this large award, at the beginning of the following quarter the claimant's resources exceeded the statutory limit and her SSI benefits were terminated. The civil action challenged the Secretary's regulation that included lump-sum SSI awards in a calculation of available resources. This Court upheld the Secretary's action as a reasonable interpretation of the statute. Further, we rejected the plaintiff's argument that just as Sec. 1383(b)(1) forbids the imposition of unfair penalties on claimants who were overpaid, it should also be construed to prevent disadvantaging those who were underpaid for lengthy periods of time. While it was assumed that much of the lump-sum payment would be used to alleviate accumulated debts, the Act in a broad sense focuses only on maintenance of acceptable present benefits:
 If the Secretary were to terminate an individual's current payments to recoup previous overpayments, the recipient may have nothing on which to live. The penalization that the provisions for waiver of overpayment are designed to avoid are of a different order of magnitude from whatever hardship Beatty will suffer. By definition, despite the termination of benefits, Beatty is able to maintain a standard of living at the federal minimum income level.
 678 F.2d at 363.
 
 
 [1]
 Section 402(a) provides: "Every [eligible] individual ... shall be entitled to an old-age insurance benefit for each month...." 42 U.S.C. Sec. 402(a)
 Section 1382(c)(1) provides: "An individual's eligibility for a benefit under this subchapter for a month shall be determined on the basis of the individual's (and eligible spouse's, if any) income, resources, and other relevant characteristics in such month...." 42 U.S.C. Sec. 1382(c)(1).
 
 
 [2]
 Title XVI provides as follows:
 Whenever the Secretary finds that more or less than the correct amount of benefits has been paid ... proper adjustment or recovery shall, subject to the succeeding provisions of this subsection, be made by appropriate adjustments in future payments to such individual or by recovery from or payment to such individual or his eligible spouse (or by recovery from the estate of either).
 42 U.S.C. Sec. 1383(b)(1).
 
 
 [3]
 Title XVI provides as follows:
 The Secretary shall make such provision as he finds appropriate in the case of payment of more than the correct amount of benefits with respect to an individual with a view to avoiding penalizing such individual or his eligible spouse who was without fault in connection with an overpayment, if adjustment or recovery on account of such overpayment in such case would defeat the purposes of this subchapter, or be against equity or good conscience...."
 42 U.S.C. Sec. 1383(b)(1).
 
 
 [4]
 The majority somehow interprets Yamasaki as standing for the proposition that the Secretary is not required to afford beneficiaries an oral hearing before the government recoups overpayments made to beneficiaries by means of the netting regulations. Yamasaki, however, declared that in any case where an overpayment has been made "there shall be no adjustment of payments to, or recovery ... from any person" who requests waiver under Sec. 404(b) absent notice to the persons affected and an informal hearing on the issue of fault, and on the issues of whether recovery would "defeat the purpose of the subchapter" or be "against equity and good conscience." 442 U.S. at 697, 99 S.Ct. at 2555
 In this case it is clear that the Secretary made overpayments, that the beneficiaries sought waiver, and that the Secretary recovered portions of the overpayments through the netting procedure. It is equally clear, however, that this recovery was made without the beneficiaries having the benefit of an oral hearing to determine whether they were entitled to waiver of the overpayments. Clearly, the government's recovery in this manner was a blatant violation of the statute and the Supreme Court's mandate in Yamasaki.
 The majority attempts to justify its holding by pointing to the language in Yamasaki that a beneficiary is not entitled to such a hearing under Sec. 404(a). Typescript 12-13. The Yamasaki Court held that a request for reconsideration of the Secretary's initial determination that an overpayment had occurred did not trigger the hearing requirement because such requests normally involve only allegations of computational or mathematical error which can be resolved on the basis of written submissions. 442 U.S. 695-96, 99 S.Ct. at 2554-55. This narrow holding, however, surely does not stand as precedent for the majority's refusal to find that the beneficiaries in this case were not entitled to a hearing. Rather than request reconsideration of the determination of overpayment on the basis of an alleged mathematical error under Sec. 404(a), they sought waiver of the overpayments under Sec. 404(b). In this situation, both the statute and Yamasaki require the government to afford the beneficiaries a hearing before the overpayments are recovered, whether the recovery is by direct recoupment or by the netting procedure we have here.
 Finally, although the majority correctly notes that Congress did not intend that every time an overpayment occurs, the government must forfeit the excess funds, typescript 15, the majority ignores the fact that Yamasaki holds that every time an overpayment occurs and the government seeks to recover the excess, the beneficiary is entitled to a prerecoupment hearing upon making a request for waiver under Sec. 404(b). 442 U.S. at 697, 99 S.Ct. at 2555.
 
 
 [5]
 The majority insists that the Secretary is free to promulgate regulations establishing any period of measurement for the computation of erroneous payments, and that the court may not disturb them unless they are arbitrary, capricious, or manifestly contrary to the statute, or, at a minimum, unreasonable. At 1147. These statements by the majority completely disregard the fact that Congress specifically structured the two entitlement programs to operate on a monthly basis. Thus, benefits are determined or calculated on a monthly basis, and eligible individuals are entitled to receive payments in a particular amount on a monthly basis. The Secretary is then authorized to make a proper adjustment or recovery if the Secretary finds that "more or less than the correct amount of payment has been made...." 42 U.S.C. Sec. 404. The majority does not dispute that the amount of such payments are calculated and paid on a monthly basis, at 1148; it merely disagrees with the conclusion that erroneous payments must be calculated on this same basis. Id. However, because individuals are only eligible to a particular amount on a monthly basis, and payments are made on this same basis, it only makes sense that the Secretary's determination of whether an incorrect payment has been made also must be geared to this monthly basis. This conclusion is even more compelling in light of the fact that any other result would wholly undercut the fundamental policy underlying Congress's enactment of the two Titles, not to mention the Supreme Court's opinion in Califano v. Yamasaki, 442 U.S. 682, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979)