**DELAWARE DIVISION OF HEALTH AND SOCIAL SERVICES, Plaintiff,**

v.

**UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, Otis Bowen, M.D., the Secretary of the United States Department of Health and Human Services and the Administrator of Health Care Financing Administration, Defendants.**

No. Civ. A. 86–233 CMW.

United States District Court, D. Delaware.

July 9, 1987.

Ann Marie Johnson, Deputy Atty.Gen., Dept. of Justice, Wilmington, Del., for plaintiff.

William C. Carpenter, Jr., U.S. Atty., and Charlene D. Davis, Asst. U.S. Atty., Wilmington, Del. (Beverly Dennis, III, Chief Counsel, Region III, and James S. Feight, Jr., Asst. Regional Counsel, Dept. of Health and Human Services, Philadelphia, Pa., of counsel), for defendants.

DELAWARE DIVISION OF HEALTH AND SOCIAL SERVICES

v.

U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, ET AL.,

TABLE OF CONTENTS

FACTS ----------------------------------------------------------------------------------------1108

DISCUSSION ............................................................................ 1109
I. JURISDICTION .................................................................. 1110
   A. The Compliance/Disallowance Distinction ........................ 1110
     1. The New Jersey Trilogy ............................................. 1111
     2. The Trilogy Applied .................................................. 1113
   B. District Court Jurisdiction Over Disallowance Proceedings ........... 1114
     1. The Statutory Language and Legislative History ...................... 1114
     2. The Split in the Circuits ............................................. 1115
       a. District Court Jurisdiction ......................................... 1115
       b. Court of Claims Jurisdiction ....................................... 1116
       c. The Preferability of District Court Jurisdiction ................... 1117
II. THE SCOPE OF REVIEW ........................................................ 1118
III. STATUTORY CONSTRUCTION ................................................. 1120
   A. The Social Security Statute and Regulations .......................... 1120
   B. Delaware Complied With The Statute But Not The Regulations ... 1122
     1. The Statute .......................................................... 1122
     2. The Regulations ..................................................... 1123
   C. The Regulations Are Arbitrary and Capricious ....................... 1124
     1. "Completed Reviews" Cannot Substitute for "Conducted Reviews" ............................................................... 1124
     2. The Good Faith Exception ............................................ 1124
     3. The Technical Failings Exception .................................... 1125
   D. The Secretary's Interpretation of the Statute and Regulations, as Upheld by the Grant Appeals Board, was Arbitrary and Capricious ............................................................ 1125
     1. Completed Review .................................................... 1125
     2. The Statutory Exceptions Construed ................................. 1126
     3. The Board's Interpretation of the Good Faith Exception is Arbitrary and Capricious ............................................. 1127
     4. The Board's Interpretation of The Technical Failings Standard is Arbitrary and Capricious ......................................... 1128
CONCLUSION ......................................................................... 1130

## OPINION

CALEB M. WRIGHT, Senior District Judge.

The question presented is whether the State of Delaware operates its nursing homes in compliance with the federal Social Security Act. The principal contention of the appellee, the Secretary of the United States Health and Human Services Department ("HHS"), is that the appellant, the Delaware Department of Health and Social Services ("Delaware"), failed to adequately inspect Delaware's nursing homes to ensure that all of its patients are, in fact, entitled to federal Medicaid payments.

In 1984, HHS denied Medicaid payments to Delaware for neglecting to inspect two nursing homes even though every patient in both facilities was reviewed, except for four residents. The State appealed the decision to the HHS Grant Appeals Board, which upheld the Secretary's determination. In reversing, this Court finds that the Appeals Board arbitrarily and capriciously interpreted the Social Security Act. Second, the Court determines that the regulations promulgated by the Secretary of HHS are impermissibly restrictive. Third, the Court holds that the Grant Appeals Board arbitrarily and capriciously upheld

the Secretary's denial of Medicaid funds to Delaware.

FACTS

Whether the sweeping Great Society programs enacted to care for this nation's elderly succeeded, either in historic terms, or in comparative relation to other nations' programs, remains an unanswered question. But whatever the achievements or shortcomings of the New Deal agenda, this Court is not the first to observe that America's system of caring for its aging, indigent population is literally the most complex in the world. The centerpiece of this system is the Social Security Act, and the current controversy involves a State challenge to a federal interpretation of that convoluted statute.

At the most fundamental level, this case concerns four elderly Americans. John McColley, age 76, is a mentally retarded man who suffers from bronchiectasis and other chronic diseases; the State of Delaware cares for him at a Seaford, Delaware nursing home. Ortel Hedwig is an 85 year old woman afflicted with degenerative osteoarthritis and the pains of an artificial hip joint; Ms. Hedwig lives in the Jeanne Jugan State Facility located in Newark, Delaware. Also residing at the Newark facility is Edith Lovell—an 87 year old woman ailing from hypertension, osteoarthritis and a fractured wrist and ankle—and Joseph Schauber, age 70, who suffers from a pancreatic disorder, paralysis of the left side of his face, and a frontal lobotomy performed 20 years ago. Record at 5, Attachment B.

HHS contends that because Delaware failed to inspect these four patients the federal government need not reimburse the State for any Medicaid funds going to all patients at the Newark and Seaford facilities. HHS constructs an intricate argument made more incomprehensible because federal transfers to the indigent are so complex that the *law* is a daily *fact* for those entitled to Medicaid. Regulations, procedures, routines, inspections, and forms circumscribe the daily existence of nursing home residents. To even proceed to discuss the facts of this case requires an explanation of the applicable law.

Title XIX of the Social Security Act established a cooperative federal-state program called "Medicaid" to provide payment for medical services, including nursing care, to individuals. The Social Security Act, 42 U.S.C. §§ 1396 *et seq.* (1982). Although States are not obligated to establish a Medicaid program, if a State chooses to do so, the federal government will reimburse that State for a percentage of the medical costs incurred by qualified recipients.

Rights engender reciprocal obligations and duties. In return for federal Medicaid payments, each State must make a "showing satisfactory to the Secretary [of HHS]" that for each calendar quarter that the State receives federal Medicaid payment, the State has an effective program of inspection and review to ensure that patients are entitled to Medicaid payments and require the care they are receiving. 42 U.S.C. § 1396b(g)(1)(A–D) (1982). The Social Security Act also mandates that the State review the medical care provided to each Medicaid recipient, in each State facility, at least annually. 42 C.F.R. 456.-652(a)(4) (1986). These reviews are to be performed by independent State inspection teams of doctors. Even if not every patient in every State facility is inspected, the State's quarterly showing may be satisfactory if one or another statutory exception is satisfied. *See* 42 U.S.C. § 1396b(g)(4)(B) (1982); 42 C.F.R. § 456.653(a-b) (1986). If a State cannot make a satisfactory showing, federal Medicaid reimbursement for that quarter is decreased according to a statutory formula. 42 U.S.C. § 1396b(g)(1) (1982). But even if a State's quarterly showing is "facially satisfactory," the Social Security Act requires the Secretary of HHS to validate the State's showing by reviewing the state's reports. 42 U.S.C. §§ 1396b(g)(2), 1396b(g)(3) (1982). *See Wisconsin v. Bowen*, 797 F.2d 391, 393 (7th Cir.1986), *cert. denied*, — U.S. —, 107 S.Ct. 926, 93 L.Ed.2d 978 (1987) (describing the operation of State Medicaid programs).

This controversy began when the Secretary of HHS reviewed Delaware's Medicaid facilities' inspection reports for the first quarter of calendar year 1984. The surveys disclosed that four recipients were not reviewed even though all the other patients in each of 40 facilities were inspected. HHS does not dispute that only four patients were missed and the agency concluded in a June 13, 1984 report that "Delaware has an effective statewide surveillance and utilization control program for ... [nursing homes]." Utilization Control Report; Record at 2, Attachment E.[1]

The problem of patient inspection occurred at the Seaford Health Care Center and the Jeanne Jugan Residence in Newark. At Seaford, during an October 1983 review, John McColley was not reviewed because his name did not appear on a Medicaid review list prepared by the State inspection team and verified with the Nursing Staff. Supplement to Record.

At Jeanne Jugan, during a November 4, 1984 review, the three other Medicaid patients were omitted from the list. In the case of one patient, Joseph Schauber, his name was omitted because his Medicaid coverage was newly reinstated on November 3, 1984, and the list had not yet been updated. Record at 2, Attachment D. The other two patients, Ortel Hedwig and Edith Lovell, were not reviewed because their names had not been placed on a State inspection list. *Id.*

After learning of the oversight, Delaware remedied the situation in August 1984. Despite this, on December 27, 1984,

HHS notified Delaware that because of its failure to inspect the four patients, it would disallow all Medicaid funds for the two facilities—totalling $201,824.62—for the calendar quarters ending March 31, 1984, June 30, 1984, and September 30, 1984. On January 25, 1985, Delaware appealed the disallowance to HHS' Grant Appeals Board.

Pending the appeal, the appellee wrote a letter to the Grant Appeals Board acknowledging that the unreviewed patients were reviewed during the August 1984 inspection and advising that the penalty would be revised to eliminate the quarter ending September 30, 1984. On March 21, 1986, the Grant Appeals Board upheld HHS' decision to disallow Medicaid funding for the two facilities for the first two quarters of 1984. The Board directed that the disallowance be recalculated in accordance with a statutory formula to reflect the precise number of recipients.

Delaware appealed the Board's decision to this District Court on May 23, 1986.

## DISCUSSION

This case, as with so many proceedings involving the payment of federal Medicaid funds to indigent nursing home patients, is mired in a morass of regulatory and procedural complexities. Before tackling the important constitutional and statutory issues raised by a denial of Medicaid funding, the Court must slice through a thicket of seemingly incomprehensible rules that accompany federal transfers to the poor: complex statutory language, labyrinthine regula-

---

1. The two homes that the federal government claims were not reviewed are considered "intermediate care facilities." The Medicaid statute defines federal "medical assistance" for needy individuals to include, among other items, "intermediate care facility services ... for individuals who are determined ... to be in need of such care." 42 U.S.C. § 1396d(a)(15) (1976). To the layman, aged people in need of care are placed in nursing homes. But under the federal regulatory structure, different "facilities" treat different individuals. There are "Skilled Nursing Facilities", "Institutions for Mental Diseases" and "Intermediate Care Facilities". 42 U.S.C. § 1396d(a)(1) (4)(A) (1976); *Id.* § 1396d(a)(14). The only facility involved in this case is the Intermediate Care Facility:

[T]he term "intermediate care facility" means an institution which is licensed under state law to provide, on a regular basis, health-related care and services to individuals who do not require the degree of care and treatment which a hospital or skilled nursing facility is designed to provide, but who because of their mental or physical condition require care and services (above the level of room and board) which can be made available to them only through institutional facilities ... The term "intermediate care facility" also includes any skilled nursing facility or hospital which meets the requirements of the [preceding] sentences.... 42 U.S.C. § 1396d(c) (1976).

tory classifications, and Byzantine jurisdictional standards.

## I. JURISDICTION

### A. *The Compliance/Disallowance Distinction*

In appealing to this Court from the Grant Appeals Board, Delaware invoked jurisdiction pursuant to the Administrative Procedure Act under general federal question jurisdiction. 5 U.S.C. § 702 (1970); 28 U.S.C. § 1331 (1976). The Appellee did not contest jurisdiction. Appellee's Brief at 16, n. 3. But subject matter jurisdiction cannot be waived, and despite the fact that neither party briefed the question of jurisdiction, the Court raises the issue *sua sponte*. Fed.R.Civ.P. 12(h)(3). Not the least of the reasons for discussing this threshold question is that it has yet to be decided in this Circuit. Sadly, in appeals of this nature, "the knotty question of [the Court's] jurisdiction overshadows the merits of the underlying dispute." *Pennsylvania v. Heckler*, 730 F.2d 923, 924 (3d Cir. 1984).

▪ The decision of the Departmental Grant Appeals Board is a "final agency action for which there is no other adequate remedy in a court." Administrative Procedure Act, 5 U.S.C. § 704 (1976). Judicial review is available unless the particular statute concerning the Board's action "preclude[s] judicial review," 5 U.S.C. § 701(a) (1976), and review is not deemed forbidden unless the statute clearly forbids review. *Abbott Laboratories v. Gardner*, 387 U.S. 136, 140–41, 87 S.Ct. 1507, 1510, 18 L.Ed.2d 681 (1967).

The problem is determining whether the statute—the Social Security Act—either prohibits judicial review or requires that this Court, or another court, scrutinize the Grant Appeals Board decision. This conundrum derives from the obscure statutory language of 42 U.S.C. § 1316 (1976) which creates two different tracks for review of a dispute involving Medicaid reimbursements to states. Under one track, there is a direct review in the Court of Appeals following the final administrative determination of disputes which are considered *"compliance* or plan-conformity disputes." (emphasis added).[2]

A second track governs issues involving the Secretary's determination "that any item or class of items on account of which federal financial participation is claimed ... shall be *disallowed* for such participation." 42 U.S.C. § 1316(d) (Supp. V 1982) (emphasis added). This section does not explicitly provide for judicial review.[3] Compliance disputes are more serious than disallowance controversies and involve the State's entire inspection program.

The Court, therefore, must conduct a bifurcated inquiry. First, the Court must determine whether the dispute between HHS and Delaware involved a question of non-compliance or whether the Secretary's determination amounted to a mere disallowance of funds. If the issue is one of compliance, jurisdiction properly lies in the Third Circuit Court of Appeals.[4] If, on the

---

**2.** "Any State which is dissatisfied with ... a final determination of the Secretary under section ... 1396(c) of this title may ... file with the United States Court of Appeals for the Circuit in which such State is located a petition for review of such determination." 42 U.S.C. § 1316(a)(3) (Supp. V 1982).

**3.** "Whenever the Secretary determines that any item or class of items on account of which Federal financial participation is claimed under subchapters I, X, XIV, XVI, or XIX of this chapter, or part A of subchapter IV of this chapter, shall be disallowed for such participation, the State shall be entitled to and upon request shall receive a reconsideration of the disallowance." 42 U.S.C. § 1316(d) (1986). *See infra*, notes 6–7.

**4.** If the Court were to determine that jurisdiction is proper in the Third Circuit, the appellants may be out of court altogether. The statute requires that a State in a compliance dispute must file for review "within 60 days after it has been notified of [a final determination of the Grant Appeals Board]." 42 U.S.C. § 1316(a)(3) (1982). The State of Delaware was notified of the determination of the Appeals Board on March 21, 1986. Record at 1. Delaware filed an appeal in this Court on May 23, 1986. There is no indication, however, that a simultaneous petition was filed with the Third Circuit. Were this Court to dismiss the case for lack of jurisdiction, it would be too late for Delaware to file a petition for review with the Third Circuit.

other hand, the question is one of disallowance, then jurisdiction does not lie in the Third Circuit. But this leads to the Court's second inquiry which is whether, assuming the dispute is characterized as a disallowance, the District Court has jurisdiction to review an opinion of the Grant Appeals Board. This question has yet to be decided in this Circuit.

### 1. *The New Jersey Trilogy*

The question of whether, for jurisdictional purposes, an administrative holding is a compliance decision or a disallowance decision is not new in this Circuit. In the *New Jersey Trilogy*, the Third Circuit devised a functional test for ascertaining the proper appellate jurisdiction over HHS denials of Medicaid funds to States. *New Jersey v. Department of Health & Human Services*, 670 F.2d 1262, 1268–77 (3d Cir.1981) ("*New Jersey I*"); *New Jersey v. Department of Health & Human Services*, 670 F.2d 1284, 1290–92 (3d Cir.), *cert. denied*, 459 U.S. 824, 103 S.Ct. 56, 74 L.Ed.2d 60 (1982) ("*New Jersey II*"); *New Jersey v. Department of Health & Human Services*, 670 F.2d 1300 (3d Cir.1982) ("*New Jersey III*"). *See also Pennsylvania v. H.H.S.*, 723 F.2d 1114 (3d Cir.1983).

■ HHS characterizes this dispute as a disallowance. Record at 1; Decision of Department Grant Appeals Bd. Del. Dep. of Health & Human Services, Dep. Grant Appeals Bd., No. 732 slip op. at 1 (HHS March 21, 1986) (final admin. review) [hereinafter cited as "Board Op. at _____"]. Were the Court to look no further than the record of the Secretary below, it would simply assert jurisdiction. But this Court is bound by the *New Jersey Trilogy* which refused to adopt an approach that allows the Secretary "to foreclose judicial review under Section 1316(a) [the compliance provision] in situations where one administrative route is pursued when another would be more appropriate." *New Jersey I*, 670 F.2d at 1271. Rather, a Court of Appeals is obligated to look beyond the label the Secretary puts on his or her actions, and is required to conduct an independent evaluation of the underlying substance of the dispute. "To do otherwise ... would make the jurisdiction of a Court of Appeals contingent upon the Secretary's unfettered discretion." *Id.* [5]

The Court must first look to the language of the statute. W. Hurst, *Dealing With Statutes* 57 (1982). If the statute is ambiguous, then the Court must be guided by the statute's legislative history. Sutherland, *Stat. Const.* § 45.01 (1943). The statute does not define either a "disallowance" [6] or a "compliance" [7] dispute, and the legislative history of the Social Security Act is not helpful. But because Congress provided scant guidance, the Third Circuit, drawing partly on some "meager indicia" of legislative intent, and an established line of Fifth Circuit cases, has enunciated a statutory interpretation in the *New Jersey Trilogy*. There, the Court reasoned that compliance disagreements "concern either the validity of a state's plan as a whole or its overall administration." *New Jersey I*, 670 F.2d at 1271. Disallowance disputes, by contrast, "are far more narrowly focused; they generally arise 'in connection with a routine audit' and involve 'the accuracy of [that] audit.'" *Id., quoting Medical Services Admin. v. United States*, 590 F.2d 135, 146 (5th Cir.1979).

---

**5.** Because this Court sits, if at all, as a "Court of Appeals" reviewing the decision of the Grant Appeals Board, the Court can make a decision about whether a disallowance or a compliance question is involved as directed by the *New Jersey Trilogy*.

**6.** If a State program is not in compliance with federal requirements, the Secretary must afford the State a formal hearing and he is subject to stringent time restrictions. 45 C.F.R. § 213 (1982). The Secretary is given sweeping powers: following a finding of noncompliance, he may eliminate *all* payments to the State, not merely those for the disputed items. 42 U.S.C. § 604(a) (1976); 45 C.F.R. § 201.6(a) (1982).

**7.** A "disallowance" proceeding is considerably less formal and affords the Secretary a more limited arsenal of sanctions. The State is entitled to reconsideration by the Department Grant Appeals Board; but the Board need not hold a hearing and is not bound to decide within any time limits. A disallowance determination entitles the Secretary to refuse payment only for the disputed item. 42 U.S.C. § 1316(d) (1976); 45 C.F.R. § 16 (1983).

The Third Circuit is squarely of the opinion that its functional approach, as opposed to the methodology adopted in other Circuits,[8] yields precise and consistent results. In practice, the compliance label has been appended to all "but those disputes involving the most technical minutiae." *Pennsylvania v. Heckler,* 730 F.2d 923, 927 (3d Cir.1984). The true mettle of the functional approach is best illustrated by comparing the Third Circuit's decision in *New Jersey III* with the Court's holdings in *New Jersey I* and *New Jersey II.* The differences provide the dividing line with which to evaluate the current controversy.

In *New Jersey I,* HHS refused to reimburse New Jersey for child-support enforcement services that the State provided to non-welfare recipients who had not filed applications required by HHS regulations. The amount that HHS declined to reimburse was almost $2 million and the case involved many non-welfare recipients suddenly subject to certain restrictions under new HHS regulations. The Court determined that review under Section 1316(a) was mandated where a State raised "difficult and significant legal issues having to do with the construction of the Social Security Act ... and [with] the legality of certain HHS administrative actions." *New Jersey I* at 1273.

In *New Jersey II,* the question decided was whether the State was entitled to amend its plan retroactively to extend coverage to certain aged, institutionalized individuals who were eligible for federal funds but had inadvertently been excluded under the State plan. The Court found that Section 1316(a) procedures were properly invoked because the dispute involved "the coverage of certain individuals under the Medicaid program, the estoppel of a federal agency for its allegedly misleading advice to State officials, and the ability of a State retroactively to alter provisions of its Social Security plan so as to maximize its receipt of federal dollars." *New Jersey II,* 670 F.2d at 1291.

In both *New Jersey I* and *New Jersey II,* the Third Circuit concluded that HHS "in effect had found that New Jersey, in the overall administration of one of its State Social Security plans, was not conforming with applicable federal requirements." *New Jersey I,* 670 F.2d at 1273; *New Jersey II,* at 1291–1292. *See also Pennsylvania v. HHS,* 723 F.2d at 1118 (the Court found a compliance dispute when Pennsylvania sought reimbursement for abortions performed between the date the Hyde Amendment took effect and the earliest date the State could notify welfare recipients of the new restriction on abortion funding); *Pennsylvania v. Heckler,* 730 F.2d 923, 927 (3d Cir.1984) (the Court again found a compliance dispute when the Department of Public Welfare sought to include part of the Philadelphia DA's welfare prosecution expenses as reimbursable costs).

Unlike *New Jersey I* and *New Jersey II,* the administrative decisions at issue in *New Jersey III* in no way affected the State's entire Medicaid plan. There the controversy centered on whether an official's one-line handwritten notation approving a nursing home was sufficient to certify the home for Medicaid purposes. The Third Circuit found an "almost archetypical" disallowance situation when the Secretary "merely refuses to credit the State for expenses incurred for a limited period of time at a single nursing home." *New Jersey III,* 670 F.2d at 1303. The Court reasoned that the failure of New Jersey's survey authority properly to inform the single State agency about the Medicaid status of a single nursing home in no way "implicate[d] the ad-

8. In determining whether a matter is properly categorized as a disallowance or a compliance matter, other circuits have fashioned their own jurisdictional tests. *See e.g., Georgia Dep't. of Medical Assistance v. Dep't. of Health & Human Services,* 708 F.2d 627 (11th Cir.1983) (a functional test); *Illinois v. Schweiker,* 707 F.2d 273 (7th Cir.1983) (employing a literal rather than a functional approach, i.e., the Court will accept HHS' characterization of the dispute as either a disallowance or a compliance); *Massachusetts v. Departmental Grant Appeals Board,* 698 F.2d 22 (1st Cir.1983) (a functional test). The Third Circuit has done the most to merge the disallowance and compliance disputes, greatly expanding the scope of the latter. This Court is bound by the Third Circuit's test.

ministration of ... New Jersey's [Medicaid] program as a whole," *New Jersey III* at 1303 *quoting New Jersey I* at 1275 (and cases cited therein).[9]

### 2. *The Trilogy Applied*

■ Because the instant case is factually similar to *New Jersey III,* not the other two New Jersey cases, the Court finds that the dispute is a disallowance rather than a compliance controversy. Given this characterization, jurisdiction does not lie in the Circuit Court.

In this case, there was never any question that HHS found Delaware's overall program to comply with federal requirements. HHS concluded in a report, prepared during the disputed period, that "Delaware has an effective statewide surveillance and utilization control program for ... skilled nursing facilities and intermediate care facilities." Utilization Control Report, Record at 2, Attachment E.

The facts of this case are significantly similar to those in *New Jersey III.* There HHS denied a claim for Medicaid disallowance in the amount of $221,824.00 on the grounds that one of New Jersey's nursing homes had not been properly certified. The denial was only at one home and only for a limited period of time. *New Jersey III,* 670 F.2d at 1303. In the case at bar,

the amount disallowed by HHS amounts to only $201,824.62 for two Delaware institutions for a limited time period—three calendar quarters. Record at 2, Attachment A.[10]

Most importantly, the disallowance dispute in the case at bar arose, as did the dispute in *New Jersey III,* from a "routine audit." *Pennsylvania v. H.H.S.,* 723 F.2d at 117. The audit did not involve any other aspects of Delaware's plan for providing health care services. Record at 2, Attachment A; Record at 2–1 to 4. The only difference between this case and *New Jersey III* is that, in the latter case, only a single health care provider was implicated. Because only one facility was involved in *New Jersey III,* it could be argued that the current controversy over two facilities is more serious and therefore is properly characterized as a compliance dispute. But, in *New Jersey III,* a team of inspectors actually found "operating deficiencies sufficient to render the institution ineligible for both Medicare and Medicaid funds." *New Jersey III,* 670 F.2d at 1301. In the case at bar, no operating deficiencies were uncovered. Rather, there was a simple failure on the part of the State to review four patients in two facilities, even though every other patient in both facilities was reviewed. Record at 2–1; Board Op. at 6. The State claimed that the only reason the

**9.** The definition of a disallowance procedure arrived at in *New Jersey III* comports with the formulations arrived at by a number of other federal courts. In *Wingate v. Harris,* 501 F.Supp. 58 (S.D.N.Y.1980), for example, New York challenged HHS refusal to reimburse it for expenses incurred by three institutions adjudged by the Department not to meet federal standards.

For other "disallowance" decisions, *see Medical Services Administration v. United States,* 590 F.2d 135 (5th Cir.1979); *County of Alameda v. Weinberger,* 520 F.2d 344 (9th Cir.1975); *State of Georgia Department of Human Resources v. Califano,* 446 F.Supp. 404 (N.D.Ga.1977). *Compare Texas Department of Public Welfare v. Califano,* 556 F.2d 326 (5th Cir.1977), *cert. denied,* 439 U.S. 818, 99 S.Ct. 78, 58 L.Ed.2d 108 (1978); *Solomon v. Califano,* 464 F.Supp. 1203 (D.Md. 1979); *Oregon v. Dept. of Health,* 727 F.2d 1411 (9th Cir.1983).

**10.** The Grant Appeals Board only awarded a penalty for two quarters. Board Op. at 21.

This is because HHS conceded that Delaware had in fact completed its annual review of the four patients during August, 1984 and, therefore, the Board did not assess a penalty for the quarter ending September 30, 1984. Record at 9–1. So the amount involved is less than $201,-824.62—the precise amount was not computed by the Grant Appeals Board because the parties did not reach agreement on the precise formula. Board Op. at 20–21. HHS suggests that the disallowance amount for the quarter ending September 30, 1984 should only be $28,312.70. Record at 5, Attachment A–2; Defendants' Answer to Amended Complaint at 1–2. HHS is in the process of refunding this amount. *Id.* Delaware, however, contends that the amount is $68,342.24. Am.Comp. at ¶ 17. *See* letter of April 27, 1987 from Ann Johnson, Deputy Attorney General. Both parties agree that the total disallowance is $201,824.62. Because the Court holds that HHS must return this full amount, there is no need to settle the dispute about the amount of the September, 1984 quarterly disallowance.

patients had not been reviewed was that "[f]or some unknown reason their names had been deleted inadvertently from the regional Medicaid list" used by the State Review team. *Id.* at 6; Record at 5, Attachment D. This failure is precisely the type of dispute involving "technical minutiae" that the Third Circuit labels a disallowance matter. *See Pennsylvania v. Heckler,* 730 F.2d at 927.

If anything, the failure to review four patients in two facilities constitutes a more technical oversight than the failure to inspect an entire facility as in *New Jersey III.* Under the applicable standards created by the Third Circuit's functional approach, the matter before this Court must be characterized as a disallowance dispute. A Circuit Court simply has no jurisdiction over such matters.

## B. *District Court Jurisdiction Over Disallowance Proceedings*

A finding that the Third Circuit has no jurisdiction is not tantamount to a conclusion that this District Court has no jurisdiction to hear a disallowance claim. Under the Social Security Act, it may be that no court has jurisdiction to hear an appeal of a disallowance claim from the Department Grant Appeals Board. The Third Circuit Court of Appeals, and to this Court's knowledge, no District Court in this Circuit, has ever addressed this question. *See New Jersey II,* 670 F.2d at 1290 at n. 11 ("It is an open question, at least in this Circuit, whether a disallowance entered by the Secretary after reconsideration under 42 U.S.C. § 1316(d) is reviewable by a District Court or, for that matter, by any other court."); *New Jersey I,* 670 F.2d at 1270–1271 (same); *Pennsylvania v. Heckler,* 730 F.2d at 926 ("This court has never had an opportunity to decide [the question] of whether a District Court has jurisdiction to review a disallowance dispute)."

## 1. *The Statutory Language and Legislative History*

To decide this case of first impression, the Court must begin with the language of the statute. All the Social Security Act provides is that whenever the Secretary

grants a disallowance, "the State shall be entitled to and upon request shall receive a reconsideration of the disallowance." 42 U.S.C. § 1316(d) (1982). The statute never indicates where the "reconsideration" shall take place. The hoary principle of statutory construction, *expressio unius est exclusio alterius,* suggests that Congress' failure to stipulate a mode of judicial review of disallowances, while specifying an avenue of appeal for plan nonconformity decisions, means that there is simply no review to be had for disallowances. But Karl Llewlleyn cautioned long ago that for each precept of statutory construction, there is an equal and opposite precept. *See generally* K. Llewellyn, The Common Law Tradition, Appendix C (1960). Further, it is much in favor to suggest that nothing can be inferred from Congressional silence. *Illinois v. Schweicker,* 707 F.2d 273, 277 (7th Cir.1983); *Herman & MacLean v. Huddleston,* 459 U.S. 375 n. 23, 103 S.Ct. 683 n. 23, 74 L.Ed.2d 548 (1983). Even if *expressio unius* is not fancied today, it could have been popular when the Social Security Act was passed in 1965. If so, however, the Court would also have to attribute to Congress knowledge of the legal presumption that final agency action is reviewable in District Court if no specific method of judicial review is prescribed by statute. *See Illinois v. Schweiker,* 707 F.2d at 277.

The legislative history provides little more guidance than the ambiguous statutory language. Some courts rely on a remark quoted by Senator Javits in the legislative debates that "to involve audit exceptions or issues other than those of plan conformity in the judicial review process would create many additional problems." *See State Dept. of Public Welfare of Texas v. Califano,* 556 F.2d 326, 329 (5th Cir. 1977), *cert. denied,* 439 U.S. 818, 99 S.Ct. 78, 58 L.Ed.2d 108 (1978). *See also* S.Rep.No. 404, 89th Cong., 1st Sess. 150–51 (1965); U.S. Code Cong. & Admin. News 1965, p. 1943. It is not certain, however, that Senator Javits' comments were addressed to § 1316(d) disallowance claims, and may have only been intended for § 1316(a)(3) plan conformity claims. *Illinois v. Schweiker,* 707 F.2d at 277.

### 2. The Split in the Circuits

The ambiguity of the statutory language and the legislative history has prompted courts to adopt different jurisdictional theories. To this Court's knowledge, no court has squarely held that a District Court does not have jurisdiction to hear a disallowance claim. The majority of courts that have considered the question hold that District Courts do have jurisdiction. A second group of courts believes that District Courts are limited in their ability to hear disallowance claims to situations where States request injunctive or other equitable relief.

### a. District Court Jurisdiction

The emerging majority view holds that District Courts have jurisdiction to review an appeal from a disallowance. This concept is grounded in the purposes of the Administrative Procedure Act and its presumption that final agency decisions are reviewable in federal District Courts. The opposing theory takes a different tack, suggesting that disallowance matters belong in the orbit of monetary claims brought against the United States and that therefore jurisdiction is properly in the United States Court of Claims. The reasoning of the emerging majority view is superior and will be adopted here.

While many Circuits, including the Third, have declined to address the issue, the Seventh Circuit holds squarely that District Courts have jurisdiction over appeals from disallowance decisions.[11] *Illinois v. Schweiker*, 707 F.2d 273 at 277–78 (7th Cir.1983). The reasoning behind *Schweiker* evinces concerns for judicial economy and a wariness of statutory interpretation. The result "reduces the pressure for an expansive interpretation of Section 1316(a)(3) and brings to center stage the practical consideration that jurisdictional lines should be clearly marked. A litigant ought to know whether he belongs in the District Court or the Court of Appeals." *Id.* at 277–278.

This analysis begs the question of whether a litigant is entitled to any review of a disallowance dispute. It may be that under the statute, once an action is categorized as a disallowance dispute, a litigant is simply out of court. Nor is there any evidence for *Schweiker*'s assertion that, if District Courts could not review disallowance matters, Courts would be tempted to stretch the language of 42 U.S.C. § 1316(a)(3) to find compliance disputes where a disallowance dispute should be found simply so that *some* court could assert jurisdiction.

Although *Schweiker*'s reasoning is suspect, its result is grounded in the important policy provisions of the Administrative Procedure Act. It reflects the centrality of "the presumption that final agency action is reviewable in [D]istrict [C]ourt if no specific method of judicial review is prescribed by statute." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 140, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967); *Rusk v. Cort*, 369 U.S. 367, 371–72, 82 S.Ct. 787, 789–90, 7 L.Ed.2d 809 (1962); *Illinois v. Schweiker*, 707 F.2d at 277, *citing* 5 U.S.C. § 703; *National Ass'n. of Home Health Agencies v. Schweiker*, 690 F.2d 932, 936 (D.C.Cir. 1982).

The Ninth Circuit and several District Courts in the Second and Eleventh Circuits also hold that District Courts have jurisdiction over disallowance disputes. *See County of Alameda v. Weinberger*, 520 F.2d 344, 347 (9th Cir.1975). A Connecticut court expressly found that "[r]eview of actions under Secton 1316(d) lies in the District Court, which has subject matter jurisdiction." *Connecticut v. Schweiker*, 557 F.Supp. 1077, 1079 (D.Conn.1983). *See* 28 U.S.C. § 1331 (Supp. IV 1980) *amending* 28 U.S.C. § 1331 (1976) *quoting* Davis, *Administrative Law Treatise* § 23.-03-1 at 373 (Supp.1982) (provision in APA section 703 for review in "court of competent jurisdiction" means, in absence of contrary statute, review in District Court, which has general jurisdiction under 28 U.S.C. §§ 1331, 1337). *See also Georgia v. Califano*, 446 F.Supp. 404 (N.D.Ga.1977), *cert.*

---

**11.** *See, e.g., Medical Services Administration v. U.S.*, 590 F.2d 135 (5th Cir.1979) (declining to decide issue); *Massachusetts v. HHS*, 698 F.2d

22 (1st Cir.1983) (same); *New Jersey Trilogy* (same).

**1116**

*denied,* 474 U.S. 1059, 106 S.Ct. 803, 88 L.Ed.2d 779 (1986) (same).

###### b. *Court of Claims Jurisdiction*

■ Other courts hold that District Court jurisdiction in disallowance matters is limited. Instead of focusing on the underlying purposes of the Administrative Procedures Act, these courts rely on the theory of the Tucker Act, which grants Court of Claims jurisdiction to hear cases brought against the United States for amounts over $10,000.00. The Eighth Circuit holds that District Courts have no jurisdiction to require HHS to return to a State federal funds withheld pursuant to a disallowance. *Minnesota v. Heckler,* 718 F.2d 852 (8th Cir.1983). The Court further deduced that the District Court's jurisdiction is limited to injunctive or other equitable relief, and concluded that "[w]e must vacate the [D]istrict [C]ourt's money award restoring past disallowance funds since jurisdiction for this claim is exclusively in the United States Claims Court." *Minnesota v. Heckler,* 718 F.2d at 857.

*Heckler* reasoned that exclusive jurisdiction of the Claims Court applies to monetary claims in excess of $10,000.00 against the United States and its agencies. The Tucker Act, 28 U.S.C. § 1491 (1976) (Supp. V 1981). "This jurisdictional limitation results in a bifurcation of claims between the District Court and the Claims Court, because the District Court is unable to grant monetary relief on claims over $10,000.00." *Minnesota v. Heckler,* 718 F.2d at 852.[12]

Even if the *Heckler* reasoning were accepted, this Court can keep jurisdiction by invoking the doctrine of pendent jurisdiction to attach the monetary claims to Delaware's claims for declaratory and injunctive relief. "Ordinarily, pendent jurisdiction is used to give federal court jurisdiction over State claims related to a federal claim properly before the court. The concept has also been used, however, to give the federal court jurisdiction over another federal claim which was otherwise not properly before the court." *Woodland Nursing Home Corp. v. Califano,* 487 F.Supp. 9, 11 (S.D.N.Y.1979) (District Court with jurisdiction over non-monetary claim can exercise pendent jurisdiction over monetary claim to provide a "common sense solution" for complete relief in one court.)[13] *See* Am.Comp. ¶¶ 17 A–F.

---

12. In reaching its conclusion, the Eighth Circuit relied on *dictum* offered by a New York District Court—the only other court to take this approach—to formulate its bifurcated inquiry. *Wingate v. Harris,* 501 F.Supp. 58, 61 (S.D.N.Y. 1980), suggested that whether a case falls within the exclusive jurisdiction of the Court of Claims or the more general jurisdiction of the District Court depends upon a proper construction of plaintiff's claims. If a case is truly one for injunctive and declaratory relief to compel the Secretary to perform his duty under the law, then jurisdiction is proper in the District Court under 28 U.S.C. §§ 1331 and 1361. But if the primary relief demanded is an award in excess of $10,000.00, then, under the Tucker Act, jurisdiction exists only in the Court of Claims. 28 U.S.C. § 1346(a)(2) 1491; *Wingate,* 501 F.Supp. at 61.

*Wingate* concluded that plaintiff's claim for a review of a disallowance decision was principally one for monetary damages in excess of $10,-000.00. *Id.* at 61. The Court found that although the *Wingate* plaintiff sought several "declarations" from the Court that HEW regulations and actions were invalid, these requests were incidental to the primary remedy requested which was an order directing payment of the monies withheld by the Secretary. The declaratory relief sought merely established the plain-

tiff's legal entitlement to his principal remedy and did not expand it in any way.

In *Wingate,* the procedural posture was that the action taken by the HEW was not finally complete, so that there was not a final administrative action. The District Court was not asked to review a final administrative decision. *Id.* at 63. The Court's suggestion that the Court of Claims might have jurisdiction over the monetary claims if administrative action became final is mere *dicta.*

In the case at bar, the primary relief sought is an order forcing the Secretary to return the funds that were disallowed to Delaware. Plaintiff's Complaint at 3; Supplement to Record dated April 14, 1987. Although the amended complaint asks for declarations that the Secretary's actions were arbitrary and capricious, and an injunction to prevent the imposition of future penalities, the primary relief sought is monetary. Am.Comp. at ¶¶ 17 A–F. Under the *Wingate dicta,* the Court would not have jurisdiction. But *Wingate* is flawed for the same reasons *Heckler* is flawed. *See* discussion, *infra.*

13. Cooperation from HHS would eliminate the need for this Court to exercise pendent jurisdiction or otherwise grant an injunction or declaratory relief. *Cf. Connecticut v. Schweiker,* 557 F.Supp. at 1091 ("This court trusts that HHS . . .

### c. The Preferability of District Court Jurisdiction

■ This Court does not have to rely on pendent jurisdiction over the injunctive claims to gain jurisdiction over the monetary claims involved here. The Court is persuaded by the Seventh and Ninth Circuits that District Courts have full jurisdiction to hear both monetary and non-monetary claims in disallowance proceedings. This position is preferable to the position of the Eighth Circuit for three reasons.

The first reason concerns judicial economy. The bifurcated proceedings advocated by the Eighth Circuit would add another layer of complexity to an arena already straining under excess jurisdictional baggage and procedural weightiness. To enter the Court of Claims in the Medicaid jurisdictional horse race would create a dilemma for litigants. Many proceedings would become fragmented with District Courts considering claims for injunctive and declaratory relief while the Court of Claims provided monetary relief. Such proceedings would in turn lead to further quarrels over whether the jurisdiction of the Claims Court is exclusive, or whether District Courts can exercise concurrent equitable jurisdiction. *See, e.g., Minnesota v. Heckler,* 718 F.2d at 858 n. 11. Ancillary problems would result from plaintiffs having to file a complaint in three forums: the Circuit Court, the District Court, and the Court of Claims.

■ The second objection to the reasoning of the Eighth Circuit derives from statutory construction. Whether a court decides to adopt the reasoning of the Eighth Circuit on the one hand, or the Seventh and Ninth Circuits on the other hand, depends on whether disallowance proceedings are characterized as a "claim against the United States" or a "review of a final agency determination." A claim properly belongs in the Claims Court while a final administrative decision properly belongs in a District Court. As a matter of statutory construction, the jurisdictional statute, 28 U.S.C. § 1491 (1976), governs "any claim against the United States ... in cases not sounding in tort ...." [14] But plaintiffs in the instant case have not brought a "claim", rather their complaint asks this Court to "overturn the defendant's decision disallowing $133,482.39 ... for failure to conduct utilization control reviews." Complaint at 3. What the plaintiffs seek sounds more like what is offered in the Social Security statute: The State "shall receive a reconsideration of the disallowance." The Social Security Act, 42 U.S.C. § 1316(d) (1976). Properly speaking, Delaware is requesting a reconsideration, not pressing a claim.[15] *See, e.g., Maryland v. Dept. of H.H.S.,* 763 F.2d 1441, 1449–1451 (D.C.Cir.1985) (holding that "an implied cause of action for damages against the United States will not be lightly inferred" and that a disallowance under the Social Security Act is not an action for money damages so the Tucker Act does not apply).

The final reason for rejecting *Heckler* is that the policies of the APA take precedence over the purposes of the Tucker Act. In the conflict between two statutes, established principles of statutory construction

will promptly restore any setoff already taken. An injunction is therefore unnecessary.").

**14.** "To provide an entire remedy and to complete the relief afforded by the judgment, the court may, as an incident of and collateral to any such judgment, issue orders directing restoration to office or position, placement in appropriate duty or retirement status, and correction of applicable records, and such orders may be issued to any appropriate official of the United States. In any case within its jurisdiction, the Court shall have the power to remand appropriate matters to any administrative or executive body or official with such direction as it may deem proper and just." Tucker Act, 28 U.S.C. § 1491 (1976).

*Cf.,* 28 U.S.C. § 1346(a)(2) (1976 & Supp. V 1981) (District Court has concurrent jurisdiction to grant monetary relief on claims under $10,000).

**15.** The Eighth Circuit's expansive interpretation of the statute, providing jurisdiction to the Court of Claims, would mean that potentially *all* appeals from the Grant Appeals Board, involving monetary claims, would properly be before the Court of Claims. But this cannot be right because under 42 U.S.C. § 1316(a)(3), the Circuit Courts have jurisdiction over compliance disputes.

mandate a broad construction of the APA and a narrow interpretation of the Tucker Act. The Court of Claims is a court of limited jurisdiction, because its jurisdiction is statutorily granted and it is to be strictly construed. 28 U.S.C. § 1491 (1982). *See Transcountry Packing Co. v. U.S.*, 215 Ct.Cl 390, 568 F.2d 1333 (Ct.Cl.1978); *Woodland Nursing Home Corp. v. Califano*, 487 F.Supp. 9, 11 (S.D.N.Y.1979). When considering the Administrative Procedure Act, the Supreme Court found that "the legislative material elucidating that seminal act manifests a congressional intention that it cover a broad spectrum of administrative action, and this Court has echoed that by noting that the Administrative Procedure Act's 'generous review provisions' must be given a 'hospitable' interpretation." *Abbott Laboratories v. Gardner*, 487 U.S. at 140–141, 87 S.Ct. at 1511. *See also Abbott Laboratories v. Celebreeze*, 228 F.Supp. 855, 864 (D.Del.1964) (holding that District Courts have jurisdiction to review agency rule making).

Much recent academic writing emphasizes the importance of District Court review of agency action. The theoretical justification for judicial review of agency action is grounded in concerns about constraining the exercise of discretionary power by administrative agencies. That power is legitimized by the technical expertise of agencies. But judicial review promotes fidelity to statutory requirements, and, when congressional intent is ambiguous, it increases the likelihood that the regulatory process will be a responsible exercise of discretion.

Judicial review is also important when considered in light of the questionable constitutional pedigree of administrative agencies. These agencies are not subject to the ordinary safeguards of public electoral accountability and separation of power. As a result, there is always the fear that administrative decisions will be marred by powerful private influences and that decisions will be taken free from public scrutiny and evaluation. Judicial review is the safe-

guard that protects the coherence and integrity of the regulatory process. *See* Cass Sunstein, *Reviewing Agency Inaction After Heckler v. Chaney*, 52 U.Chi.L.Rev. 653, 655–657 (1985). *See also* Sunstein, *Factions and Self-Interest*, 72 U.Va.L.Rev. 271 (1986).

The policies of the APA take precedence over the Tucker Act and plaintiff's action should properly be treated as a final agency action reviewable in District Court.[16]

## II. THE SCOPE OF REVIEW

Before deciding the merits, this Court must continue its jurisdictional odyssey and address the proper standard of review for dissecting the Grant Appeals Board decision. Choosing the correct standard—and giving that standard meaningful structure and content—is one of the more difficult tasks in administrative law.

Reflecting differing theoretical concerns, the Administrative Procedure Act provides for four types of review: de novo, clearly erroneous, substantial evidence, and review to ensure that decisions are neither arbitrary nor capricious. *De novo* review is reserved for those situations when an administrative action is adjudicatory in nature and the agency fact finding procedures are inadequate or when issues not before the agency are raised in a proceeding to enforce non-adjudicatory agency action. *See Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). *De novo* review rarely applies and does not here.

Much debate surrounds the differences between the substantial evidence test, the clearly erroneous standard and the arbitrary and capricious standard. Some commentators even suggest that the standards are the same. *See* Davis, *Administrative Law Treatise*, § 29.00 p. 519 (1982 Supp.).

The usual standard of judicial review of agency action is the arbitrary and capricious standard. A court may only set aside findings and conclusions deemed to be "ar-

---

**16.** The language of 42 U.S.C. § 1316(a) to the effect that States may receive "a *reconsideration* of the disallowance" indicates that judicial review in a District Court is more appropriate than the filing of a separate action in the Court of Claims.

bitrary, capricious, and an abuse of discretion or otherwise not in accordance with the law or unsupported by substantial evidence in the record as a whole." 5 U.S.C. § 706(2)(A); *Samaritan Health Services v. Heckler,* 619 F.Supp. 713, 718 (D.D.C.1985), *rev'd., Samaritan Health Services v. Bowen,* 811 F.2d 1524 (D.C.Cir.1987); *Colo. Dept. of Soc. Serv. v. Dept. of Health,* 558 F.Supp. 337 (D.Colo.1983). An "arbitrary and capricious" finding is one where the agency has made a clear error of judgment.[17]

■ When an agency interprets a statute in establishing regulations, the arbitrary and capricious standard is not, however, automatically applied. Under the principle of clear statement,[18] recently enunciated by the Supreme Court, courts must first determine whether Congress delegated to an agency the power to interpret a statute.

■ First, the Court must determine whether Congress has spoken clearly on the meaning of the statute. If it has, that ends the matter and no agency interpretation is needed. If the statute is ambiguous, the Court must then decide whether Congress explicitly or implicitly delegated to an agency the power to explain a statute through regulation. If the delegation is explicit, an arbitrary and capricious standard applies.[19] If, however, the delegation is implicit, a reasonableness standard governs.

In applying this two-part standard, the Court finds that Congress has not spoken clearly on the meaning of the statute in question. The intent of Congress as to what constitutes compliance with the Social

---

**17.** The scope of review under an arbitrary and capricious standard is ordinarily confined to the record generated at the administrative hearing; it may, however, be supplemented when the Court finds that the record is inadequate to disclose factors upon which the administrator's decision was based. *Overton Park,* 401 U.S. at 419–20, 91 S.Ct. at 825; *American Iron and Steel Institute v. EPA,* 568 F.2d 284, 296 (3d Cir.1977).

When reviewing under the arbitrary and capricious standard, the District Court sits neither as a fact finder nor as a judge of the weight of the evidence. An agency is entitled to deference in interpreting the statutory and regulatory provisions which it is charged to administer. *See Udall v. Tallman,* 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 *reh. den.* 380 U.S. 989, 85 S.Ct. 1325, 14 L.Ed.2d 283 (1965). Unless the interpretation is "plainly erroneous or inconsistent with the [statute or] regulations, ..." the Court owes a deference to an agency's administrative interpretation. *Lucas Coal Co. v. Interior Board of Mine Operations Appeals,* 522 F.2d 581, 584 (3d Cir.1975). The task of the Court, however, is not to routinely endorse agency action but rather to review thoroughly the administrative record to insure that a rational basis exists for the agency's action. "If such a rational basis exists, the inquiry must end there and the wisdom of the agency's action is of no further judicial moment." *Lukens Steel Co. v. Klutznick,* 629 F.2d 881, 886 (3d Cir.1980).

**18.** This principle marks a return to a conception of formalism in administrative law and requires a reviewing Court to conduct a two part inquiry:

"When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.... If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute. Sometimes the legislative delegation to an agency on a particular question is implicit rather than explicit. In such a case, a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." *Lugo v. Schweiker,* 776 F.2d [1143] at 1147, [(3d Cir.1985) ], *quoting Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

**19.** For criticism of the principle of clear statement as ineffective to check the dangers of self-interested representation and factional power, *see* Sunstein, *Factions and Self Interest,* 72 U.Va.L.Rev. 271, 288 (1986); Sunstein, *In Defense of the Hard Look,* 7 Harv.J. of Law & Public Policy 51, 58 (1986).

Security Statute is ambiguous. This very equivocation spawned the current controversy, and this Court is not the first to note the mystical properties of the Social Security Act. The statute was dismissed by one court as "an aggravated assault on the English language, resistant to attempts to understand it." *Friedman v. Berger*, 409 F.Supp. 1225, 1226 (S.D.N.Y.1976), *aff'd.*, 547 F.2d 724 (2d Cir.1976), *cert. denied*, 430 U.S. 984, 97 S.Ct. 1681, 52 L.Ed.2d 378 (1977). The Supreme Court is just as uncharitable. "The Social Security Act is among the most intricate ever drafted by Congress. Its Byzantine construction, as Judge Friendly has observed, makes the Act almost unintelligible to the uninitiated." *Schweiker v. Gray Panthers*, 453 U.S. 34, 43, 101 S.Ct. 2633, 2640, 69 L.Ed.2d 460 (1981), *quoting Friedman v. Berger*, 547 F.2d at 727 n. 7.

Because Congress' intent as to the meaning of the statute is unclear, the Court must then decide whether Congress explicitly directed the Secretary to interpret the statute. Although the statute requires that States "make a showing satisfactory to the Secretary" that they have inspected their nursing homes, there is no explicit direction to the Secretary to interpret the requirements of the statute. 42 U.S.C. § 1396b(g)(4)(B) (1982). *See Bowen v. Yuckert*, ⎯ U.S. ⎯, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987); *see, e.g., Wisconsin v. Bowen*, 797 F.2d at 397 (distinguishing *Schweiker v. Gray Panthers*, 453 U.S. 34, 101 S.Ct. 2633, 69 L.Ed.2d 460 (1981), and noting that Congress did not expressly delegate power to interpret the compliance portion of the Social Security Act). At most, there is only an implicit delegation of authority to the Secretary to interpret the statute. Therefore, the District Court must defer only if the Secretary's interpretation of the statute is reasonable and statutorily permissible. This is a less deferential standard than the arbitrary and capricious standard.

The "clear statement" principle appears to require a reasonableness standard of review, and that is the basic yardstick the Court will employ. But the proper scope of review is a much debated and constantly changing standard. Therefore, the Court will also review the Appeals Board decision under the more deferential arbitrary and capricious standard. Under either standard, the Board's opinion must be reversed.

## III. STATUTORY CONSTRUCTION

Having taken jurisdiction, and identified the standard of review, the Court now scrutinizes HHS' actions in light of the Social Security Act and attendant regulations. First, the Court will provide an overview of statutory and regulatory inspection requirements imposed on States that receive Medicaid funding for nursing homes. Second, the Court finds that Delaware complied with the literal requirements of the Social Security Act, but not with the Secretary's regulations. Third, the Court concludes that the regulations interpreting the Social Security Act are arbitrary and capricious and must be struck down. Finally, the Court holds that the Secretary's interpretation of the statute and regulations, as upheld by the Grant Appeals Board, was arbitrary and capricious and must be overturned.

### A. *The Social Security Statute and Regulations.*

The Social Security Act requires that the State agency responsible for the administration of the State's medical plan submit quarterly reports demonstrating that the State "has an effective program of medical review of the care of patients in ... intermediate care facilities ... whereby the professional management of each case is reviewed and evaluated at least annually by independent professional review teams." 42 U.S.C. § 1396b(g)(1)(D) (1982) (Supp. III 1985).[20] If an inadequate showing is made, the Secretary may reduce the State's

---

**20.** "[A] State [must have] an effective program of medical review of the care of patients in mental hospitals, skilled nursing facilities and intermediate care facilities pursuant to section 1902(a)(26) and (31) of this title whereby the professional management of each case is reviewed and evaluated at least annually by independent professional review teams." 42 U.S.C. § 1396b(g)(1)(D) (1982) (Supp. III 1985).

Medicaid grant by using a statutory formula. 42 U.S.C. § 1396b(g)(5) (1982).[21]

Congress attempted to modify this rigid inspection requirement in another part of the statute. An exceptions clause permits the Secretary to find a satisfactory showing if the State makes a good faith inspection effort within certain limits. An adequate showing is made if the State *"conducts"* an on-site inspection during a one year period ending on the last date of the calendar quarter in each of not less than 98% of all facilities requiring such inspection and in every facility of 200 or more beds. The statutory exception also requires that "with respect to such ... facilities not inspected within such period, the State has exercised good faith and due diligence in attempting to conduct such inspection, or if the State demonstrates to the satisfaction of the Secretary that it would have made such a showing but for failings of a technical nature only." 42 U.S.C. § 1396b(g)(4)(B) (1982) (Supp.III 1985).[22]

The statute never addresses the question before the Court today: Whether the State's failure to review a single patient, when all other patients in a facility are

21. "In the case of a State's unsatisfactory or invalid showing made with respect to a type of facility or institutional services in a calendar quarter, the per centum amount of the reduction of the State's Federal medical assistance percentage for that type of services under paragraph (1) is equal to 33⅓ per centum multiplied by a fraction, the denominator of which is equal to the total number of patients receiving that type of service in that quarter under the State plan in facilities or institutions for which a showing was required to be made under this subsection, and the numerator of which is equal to the number of such patients receiving such type of services in that quarter in those facilities or institutions for which a satisfactory and valid showing was not made for that calendar quarter." 42 U.S.C. § 1396b(g)(5) (1982).

The Secretary's regulations define with more precision the penalty formula:

(a) For each level of care specified in a provider agreement, and for each quarter for which a satisfactory showing is not made, the amount of the reduction in Medicaid payments is computed as follows:

(1) For each level of care, the number of recipients who received services in facilities that did not meet the requirements of this subpart is divided by the total number of recipients who received services in facilities for which a showing was required under this subpart. If any of the requirements specified in § 456.652(a)(2) through (4) were not met for any recipient in a facility, the reduction will be computed on the total number of recipients in that facility at the level of care in question.

(2) The fraction obtained in paragraph (a)(1) of this section is multiplied by one-third.

(3) The product obtained in paragraph (a)(2) of this section is multiplied by the Federal Medical Assistance Percentage (FMAP).

(4) The product obtained in paragraph (a)(3) of this section is multiplied by the agency payments for long-stay services furnished during the quarter of that level of care.

(b) If any of the data required to compute the amount of the reduction in FFP are unavailable, the Administrator will substitute an estimate. If the agency determines the exact data to the satisfaction of the Administrator, the estimate may later be adjusted. If the number of recipients in individual facilities is not available, the fraction specified in paragraph (a)(1) of this section will be estimated, for each level of care, by dividing the number of facilities for which a showing is required under this subpart." 42 C.F.R. § 456.657 (1986).

The penalty calculation by quarter was: *Intermediate Care Facilities*

*1st Quarter* 01/01/84–03/31/84:
$3,875,531 $\times$ ⅓ $\times$ ²⁄₂₉ $\times$ ²,⁰¹⁸⁄₂,₂₀₇ = $81,463.08

*2nd Quarter* 04/01/84–06/30/84:
$4,681,149 $\times$ ¹⁄₁ $\times$ ²⁄₃₁ $\times$ ²,⁰¹⁹⁄₂,₂₀₇ = $92,048.84

*3rd Quarter* 07/01/84–09/30/84:
$1,439,844 $\times$ ⅓ $\times$ ²⁄₃₁ $\times$ ²,⁰¹⁸⁄₂,₂₀₇ = $28,312.70

Total Disallowance = $201,824.62. Record, Attachment A, Enclosure 2.

22. "(B) The Secretary shall find a showing of a State, with respect to a calendar quarter under paragraph (1), to be satisfactory under such paragraph with respect to the requirement that the State conduct annual on-site inspections in mental hospitals, skilled nursing facilities, and intermediate care facilities under paragraph (26) and (31) of section 1902(a), if the showing demonstrates that the State has conducted such an on-site inspection during the 12–month period ending on the last date of the calendar quarter—

(i) in each of not less than 98 per centum of the number of such hospitals and facilities requiring such inspection, and

(ii) in every such hospital or facility which has 200 or more beds, and that with respect to such hospitals and facilities not inspected within such period, the State has exercised good faith and due diligence in attempting to conduct such inspection, or ... that it would have made such a showing but for failings of a technical nature only." 42 U.S.C. § 1396b(g)(4)(B) (1982) (Supp. III 1985).

reviewed, constitutes a failure to "conduct ... [an] inspection"? Neither does the statute answer the related question of whether Delaware's inspection effort falls within one of the statutorily created exceptions.

To implement the provisions of the Medicaid statute granting aid to States, the Secretary promulgated regulations defining when the agency's showing is satisfactory. The regulations track the statutory language, but add two important changes:

> With respect to all unreviewed facilities, the agency exercised good faith and due diligence by attempting to review those facilities and would have succeeded *but for events beyond its control which it could not have reasonably anticipated;* or
>
> (b) The agency demonstrates that it failed to meet the standard in paragraphs (a)(1) and (2) of this section by the close of the quarter for technical reasons, but met the standard within 30 days after the close of the quarter. *Technical reasons are circumstances within the agency's control.*

42 C.F.R. § 456.653 (1986) (emphasis added).[23]

Whether the State of Delaware complied with the statute and subsequent regulations is the issue before the Court.

### B. *Delaware Complied With The Statute But Not The Regulations.*

#### 1. *The Statute*

■ The Social Security Act requires that the "professional management of each case is reviewed and evaluated at least annually." 42 U.S.C. § 1396b(g)(1)(D)

(1982). But the exceptions clause of the statute reveals that the review of each case in each hospital is merely a goal, not a requirement. The statute further intimates that the State has made a showing if it "has conducted such an on-site inspection" in 98% of the facilities requiring inspection, *and* in every facility with 200 or more beds, *and* that with respect to facilities not inspected, the State has exercised "good faith and due diligence" *or* if the State demonstrates to the Secretary that the failings were of a technical nature. 42 U.S.C. § 1396b(g)(4)(B) (1982) (Supp. III 1985) (emphasis added).

Arguably, the State has complied with the statute because it has conducted an on-site inspection in 100% of its facilities. Nowhere does the statute define "on-site inspection" such that every patient in every facility must be inspected. Even assuming that the State has not inspected 2 out of 42 facilities—fewer than the 98% requirement—it appears plain under the statute that the State falls within the good faith and technical failings exception. The State certainly demonstrated "good faith and due diligence" by conducting reviews of every patient in every facility with the exception of four individuals.

The Social Security Act, because of its remedial purposes, must be broadly construed to favor the intended beneficiaries of the Medicaid program. *Gartmann v. Secretary U.S. Dept. of Health,* 633 F.Supp. 671 (E.D.N.Y.1986). Courts must not "disentitle the old, chronically ill and basically helpless, bewildered and confused people ... from the broad remedy Congress intended for senior citizens." *Ridge-*

---

**23.** "The administrator will find an agency's showing satisfactory, even if it failed to meet the annual review requirements of § 456.-652(a)(4), if—

(a) The agency demonstrates that—

(1) It completed reviews by the end of the quarter in at least 98 percent of all facilities requiring review by the end of the quarter.

(2) It completed reviews by the end of the quarter in all facilities with 200 or more certified Medicaid beds requiring review by the end of the quarter; and

(3) With respect to all unreviewed facilities, the agency exercised good faith and due dil-

igence by attempting to review those facilities *and would have succeeded but for events beyond its control which it could not have reasonably anticipated;* or

(b) The agency demonstrates that it failed to meet the standard in paragraphs (a)(1) and (2) of this section by the close of the quarter for technical reasons, *but met the standard within 30 days after the close of the quarter. Technical reasons are circumstances within the agency's control.* (Emphasis added). 42 C.F.R. § 456.-653 (1986).

*ly v. Secretary of Department of Health, Education and Welfare,* 345 F.Supp. 983, 993 (D.Md.1972).

To the extent that the Board's opinion finds that Delaware's inspection program violates the Medicaid statute, the decision was unreasonable. The Board's opinion was also arbitrary and capricious and will be reversed.

### 2. *The Regulations.*

Although Delaware complied with the plain language of the statute, the Board correctly determined that the State has not adhered to the Secretary's regulations.

First, the State cannot qualify for the good faith exception because the failure to review four patients did not demonstrate that the State "would have succeeded but for events beyond its control which it could not have reasonably anticipated...." 42 C.F.R. § 456.653 (1986). The ability to identify patients within State facilities enti-

tled to Medicaid payments rests entirely within the State's control.

Neither did the State come under the technical failing exception. The regulations require the State to meet the standard, i.e., review the four patients "within 30 days after the close of the quarter." The reason for not reviewing the patients was technical—the review lists were circumstances within the agency's control—but the State review was not performed until 30 days past the end of the quarter.[24] 42 C.F.R. § 456.653 (1986). Delaware did not perform the reviews until August 15, 1984. Record at 2, Attachments B, C and D. Therefore, the State was in compliance with the regulation only for the third quarter of 1984, ending September 30, 1984.

No penalty can be assessed for the third quarter, and the Grant Appeals Board so held. Board Op. at 20. The federal government is "in the process" of refunding the disallowance for this quarter. Answer to Am.Comp. at ¶ 3. Under the regu-

---

**24.** The annual review requirements are as follows:

§ 456.651 DEFINITIONS.

For purposes of this subpart—

"Facility", with respect to inpatient psychiatric services for individuals under 21, includes a psychiatric program as specified in § 441.151 of this chapter.

"Level of care" means one of the following types of inpatient services: hospital, mental hospital, skilled nursing facility, intermediate care facility, or psychiatric services for individuals under 21.

"Long-stay services" means services provided to a recipient after a total of 60 days of inpatient stay (90 in the case of mental hospital services) during a 12–month period beginning July 1, not counting days of stay paid for wholly or in part by Medicare.

§ 456.652 REQUIREMENTS FOR AN EFFECTIVE UTILIZATION CONTROL PROGRAM.

(a) *General Requirements.* In order to avoid a reduction in [federal payments], the Medicaid agency must make a satisfactory showing to the Administrator, in each quarter, that it has met the following requirements for each recipient:

(1) Certification and recertification of the need for inpatient care, as specified in §§ 456.-60, 456.160, 456.260, 456.360 and 456.481.

(2) A plan of care established and periodically reviewed and evaluated by a physician, as specified in §§ 456.80, 456.180, 456.280, 456.380 and 456.481.

(3) A continuous program of utilization review under which the admission of each recipi-

ent is reviewed or screened in accordance with section 1903(g)(1)(C) of the Act; and

(4) A regular program of reviews, including medical evaluations, and annual on-site reviews of the care of each recipient, as specified in §§ 456.170, 456.270, 456.370, and 456.482 and Subpart I of this part.

(b) *Annual on-site review requirements.* (1) An agency meets the quarterly on-site review requirements of paragraph (a)(4) of this section for a quarter if it completes on-site reviews of each recipient in every facility in the State, and in every State-owned facility regardless of location, by the end of the quarter in which a review is required under paragraph (b)(2) of this section.

(2) An on-site review is required in a facility by the end of a quarter if the facility entered the Medicaid program during the same calendar quarter 1 year earlier or has not been reviewed since the same calendar quarter 1 year earlier. If there is no Medicaid recipient in the facility on the day a review is scheduled, the review is not required until the next quarter in which there is a Medicaid recipient in the facility.

(3) If a facility is not reviewed in the quarter in which it is required to be reviewed under paragraph (b)(2) of this section, it will continue to require a review in each quarter until the review is performed.

(4) The requirement for an on-site review in a given quarter is not affected by the addition or deletion of a level of care in a facility's provider agreement.

lations, however, the State was not in compliance for the first two quarters of 1984—quarters ending June 30, 1984 and March 31, 1984.

Because the State falls into neither the technical failing exception nor the good faith exception for the first two quarters of 1984, Delaware had not "completed review" of 98% of all facilities requiring review. 42 C.F.R. § 456.653 (1986). Since Delaware was not in compliance, the Court must now evaluate the regulations to determine whether they are reasonable interpretations of the Social Security Act.

### C. *The Regulations Are Arbitrary and Capricious*

#### 1. *"Completed Reviews" Cannot Substitute for "Conducted Reviews"*

■ Delaware argues, *inter alia,* that the regulations prescribed by the Secretary are unduly restrictive and should be struck down as violative of the statute. The State suggests that the Secretary's regulations substitute the more restrictive term "completed review" for the statute's term "conducted review." Opening Brief at 21. The statute does not define what "conducting" a review means. Nor does it stipulate whether "conducting" a review requires that every patient in every facility be reviewed.[25]

The plain meaning of "conducted" is to "have the direction of; manage, carry on." Webster's New Collegiate Dictionary 172 (2d ed. 1956). The plain meaning of "completed" is "brought to an end, concluded." *Id.* at 169. No matter how an inspection is defined—by facility or by patient—the regulations unreasonably supersede the "conducted" language of the statute with a completion requirement. This attempted revision of the statutory language is not only unreasonable; it is arbitrary and ca-

pricious. The regulation must be overturned.

#### 2. *The Good Faith Exception*

■ The State also argues that the regulations are invalid because the Secretary's interpretation of the "good faith and due diligence" and of the "technical failings" exceptions are impermissibly more restrictive than those provided in the Social Security Act. The regulations interpret "good faith and due diligence" to mean "circumstances beyond the agency's control." 42 C.F.R. § 456.653 (1986). This is an objective standard, requiring the State to prove objectively that because of some factor beyond its control, the State cannot review the facility. But the legislative history explicitly requires a subjective standard. The Conferees agreement on the 1977 Social Security Act Amendments provides that: "If a facility is not reviewed, there will be a reduction in matching unless the Secretary finds there was a good faith *attempt* to review the institution, and there is no evidence that any institution, or kind or type of institution, is *deliberately* not reviewed." H.Rep. No. 95–673, 95th Cong., 1st Sess. 48 (1977), U.S. Code Cong. & Admin. News 1977, pp. 3039, 3122 (emphasis added).

By using the term "attempt" and by mandating that facilities are not "deliberately" unreviewed, the legislature plainly directed the Secretary to employ a subjective standard that focuses on the State's good faith. This interpretation comports with the statutory language that requires a showing that the State "has exercised good faith." 42 U.S.C. § 1396b(g)(4)(B)(ii) (1982) (Supp. III 1985). The cynosure of the statute is on the intentions of the State; the emphasis of the regulations is on proving something other than the State's intentions. In order for an agency interpreta-

---

**25.** Some additional principles of judicial review apply when a Court analyzes an agency's promulgation of regulations. The Secretary's substantial power to promulgate regulations is not unlimited. The regulations "cannot supersede the language chosen by Congress." *Mohasco Corp. v. Silver,* 447 U.S. 807, 100 S.Ct. 2486, 65 L.Ed.2d 532 (1980). When the Secretary oversteps his statutory authority, or if the regulation is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, it will be invalidated. *Heckler v. Campbell,* 461 U.S. 458, 466, 103 S.Ct. 1952, 1956, 76 L.Ed.2d 66 (1983); *Yuckert v. Heckler,* 774 F.2d 1365, 1369 (9th Cir.1985), *rev'd. on other grounds Bowen v. Yuckert,* — U.S. —, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987).

tion to be granted deference, it must be consistent with the congressional purpose. *Morton v. Ruiz,* 415 U.S. 199, 237, 94 S.Ct. 1055, 1075, 39 L.Ed.2d 270 (1974).

If a regulation promulgated under the Social Security Act is more restrictive than the standards provided by federal statute, it is void. *Regents of Univ. of Cal. on Behalf of Univ. of Cal. Davis Medical Center v. Heckler,* 771 F.2d 1182 (9th Cir. 1985). And while a regulation promulgated by the Secretary may be helpful in clarifying the language of the statute, it should not be read to destroy the spirit and intent of the law. *Whitman v. Weinberger,* 382 F.Supp. 256, 262 (E.D.Va.1974). The "good faith" exception regulation is unreasonably restrictive and conflicts with the language of the statute. Because the language of the regulation directly contradicts Congress' intent, the regulation must also fail as being arbitrary and capricious.

### 3. *The Technical Failings Exception*

██ Delaware also opposes the Secretary's regulations allowing an exception to the compliance requirement for "technical reasons." The challenge is to the requirement that the standard be met 30 days after the close of the quarter and that technical reasons are "circumstances within the agency's control."

While the legislative history is silent as to what constitutes a "technical failing", it does specify that the exception covered instances where a state had reviewed patients in most facilities on time, with the remaining facility reviewed within several weeks after the end of the quarter. S.Rep. No. 95–453, 95th Cong., 1st Sess. 41 (1977). The 30 days requirement is a reasonable application of "several weeks" as required by the statute and therefore will be upheld.

The requirement that technical reasons are "circumstances within an agency's control" also is a reasonable interpretation of the statutory requirement that the State demonstrate to the satisfaction of the Secretary that it would have made a showing "but for failings of a technical nature only." 42 U.S.C. § 1396b(g)(4)(B) (1982) (Supp. III 1985). To say that technical

reasons are reasons within the State's control is sufficiently broad as to be consistent with the reasonableness approach developed in the legislative history. Many matters will be in the control of the State and, on its face, the regulation would appear to encompass the case at bar where a state failed to inspect a *de minimus* number of patients due to poor record keeping.

### D. *The Secretary's Interpretation of the Statute and Regulations, as Upheld by the Grant Appeals Board, was Arbitrary and Capricious*

The Secretary's interpretation of the statute and regulations, as upheld by the Grant Appeals Board, is also arbitrary and capricious. The Board's holding that the Secretary's completed review requirement, "good faith" exception and "technical failings" exception are valid, is overturned.

### 1. *Completed Review.*

██ The Secretary argues, and the Board concurs, that in order to comply with the statute, a State "is required to review every patient in every facility due for review." Board Op. at 7, Record at 14, p. 6.

Neither the language of the statute nor its legislative history supports this draconian interpretation. The statute nowhere requires review of every patient. Rather, it speaks of inspections at "facilities". 42 U.S.C. § 1396b(g)(4)(B) (1982) (Supp. III 1985). Moreover, the penalties assessed for failing to review a facility are the loss of that facility's Medicaid funds—not simply the funds of each patient. 42 U.S.C. § 1396b(g)(5) (1982). And even the regulations mirror the language of the statute that speaks of "facilities" rather than each patient. *See* 42 C.F.R. 456.652 (1986); 42 C.F.R. 456.653 (1986); 42 C.F.R. 456.657 (1986) (assessing a penalty based on the "facility"); 42 C.F.R. 456.653 (1986) (speaks of "unreviewed facilities" and not unreviewed patients). *See also* Record at 14, p. 7 (defining the technical failing exception in terms of a "facility" approach).

The statute does suggest that a State must have an "effective program ... whereby the professional management of each case is reviewed" annually. 42 U.S.C.

§ 1396b(g)(1)(D) (1982) (Supp. III 1985). But having an "effective program" does not impose an absolute requirement that every patient be reviewed. More importantly, the strictures of 42 U.S.C. § 1396b(g)(1)(D) (1982) (Supp. III 1985) must be read in conjunction with the exceptions clause, 42 U.S.C. § 1396b(g)(4)(B) (1982). Read simultaneously, the statute plainly does not require that every patient in every facility be reviewed; otherwise, there would be no purpose to a clause that waives penalties even in cases where entire facilities go unreviewed.

Nor does the legislative history support the Board's restrictive interpretation. The Medicare-Medicaid Anti-Fraud and Abuse Amendments of 1977 plainly evinced congressional intent that a "standard of reasonableness" should govern in determining whether States have adequately inspected nursing homes:

> The section further clarifies the condition a State must meet to be deemed in full compliance with the onsite medical and independent review requirements. It must demonstrate good faith efforts to conduct on-site surveys in all … ICF's … and actually conduct such surveys in all large institutions, and in all other institutions in the State. This provision was included because HEW has announced penalties on States *which failed to review only two or three homes out of hundreds of homes subject to review within the annual time limit.* In light of the Secretary's position that HEW has no discretion in determining that the requirements of the law have been met, the *Committee has provided a standard of reasonableness in the bill.* H.Rep. No. 95–393, 95th Cong., 1st. Sess.Pt. II at 85 (1977), U.S. Code Cong. & Admin. News 1977, p. 3088 (emphasis added).

Under the statutory guidelines, Congress could not penalize a State for failing to inspect four *patients,* when it is unwilling to penalize a State for neglecting to review two or three *homes.* Nothing in the legislative history intimates that Congress requires each patient in every facility to be reviewed. The statutory reasonableness language contrasts vividly with the rigid interpretation offered by the Grant Appeals Board. And even the Secretary, in his interpretation of the rules, recognizes that the 1977 Amendments were designed to liberalize the penalty provisions and make a finding of compliance easier. Record at 14; HCFA-at–77–106, November 11, 1977.

The Secretary's argument, taken to its logical conclusion, reveals the arbitrary and capricious nature of HHS' actions. If the Secretary's interpretation is correct, a small State like Delaware can neglect to review one patient in one facility and fail to meet the statutory requirement that 98% of all facilities be reviewed. At the same time, a large State like New York, that has several hundred facilities, could fail to review every patient in four facilities and still maintain an adequate showing. This application of the statute is arbitrary and capricious. Furthermore, it contradicts the Supreme Court's holding in *Morton v. Ruiz,* 415 U.S. 199, 236, 94 S.Ct. 1055, 1075, 39 L.Ed.2d 270 that "[i]n order for an agency interpretation to be granted deference, it must be consistent with the congressional purpose." *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 381, 89 S.Ct. 1794, 1802, 23 L.Ed.2d 371 (1969).

The Board's holding that every patient in every facility must be reviewed in order to comply with the Medicaid statute is not only unreasonable, it is arbitrary and capricious and must be overturned.

2. *The Statutory Exceptions Construed.*

■ The Board's interpretation of the "good faith and due diligence" statutory exception is also arbitrary and capricious.

There are two ways to read the statutory exception carved out in the Social Security Act. 42 U.S.C. § 1396b(g)(4)(B) (1982) (Supp. III 1985). Under the Board's interpretation the statutory exceptions for good faith and technical compliance only apply when a State has in fact *completed* a review of 98% of all facilities due for review. Board Op. at 17. Only then can the State assert the good faith and technical compli-

ance exceptions for the remaining 2% of facilities. Under this interpretation, Delaware failed to review 98% of all its facilities because not *every* patient in two facilities was reviewed.

The second possible way to interpret this statute is in the literal, and correct, manner. This reading suggests that the good faith and technical failings exceptions apply even if 98% of all facilities have not had their review completed. When the showing of "conducted" reviews is unsatisfactory, "with respect to such hospitals and facilities not inspected", the good faith and technical failings exception applies. 42 U.S.C. § 1396b(g)(4)(B) (1982) (Supp.III 1985). Under this reading, the State need not meet the 98% standard by the close of the quarter, as long as the State has technical reasons for doing so or has exercised good faith. A State may satisfy the 98% test if it meets the good faith or technical failings exception. This is very different than the Secretary's suggestion that the State must meet the 98% standard *before* the good faith and technical failings exceptions can even be considered.

The Secretary's interpretation contradicts the plain meaning of the statute. The law requires that the review of 98% of the State facilities be "conducted". The regulations, and the Secretary's interpretations, however, change the requirement, so that each State must "complete" 98% of the reviews rather than merely "conduct" them. This reading violates the statute's requirement that if more than 2% of the facilities are not satisfactorily reviewed, the good faith and/or technical failings test determines whether the reason for the deficiency falls within the exception. The Grant Appeals Board concedes that the Secretary's interpretation is *not* the literal reading of either the regulations or of the statute.[26] "We reject this interpretation [that the exceptions apply even if 98% of the facilities do not have complete reviews] even though it represents a literal reading of the regulation." Board Op. at 11, n. 5. [The language of the regulation is the same as the language of the statute].

When the plain meaning of a statute or regulation is clear and unambiguous on its face, the Court may not defer to agency interpretation. *Pfizer, Inc. v. Heckler*, 735 F.2d 1502 (D.C.Cir.1984). In entirely ignoring the plain meaning of the regulations and the statute, the Board's decision is not only unreasonable, but is arbitrary and capricious and will be set aside.

### 3. *The Board's Interpretation of the Good Faith Exception is Arbitrary and Capricious*

█ Although the regulations impermissibly narrow the scope of the statute, the Secretary's interpretation of good faith and due diligence is even more restrictive. HHS regulations require that, in order to fall within the good faith and due diligence exception, a State must show that it would have reviewed the facilities "but for events beyond its control which it could not have reasonably anticipated." 42 C.F.R. 456.653 (1986). The Secretary construes these events to include a "quarantine" of a facility, that a review team could not reach the facility because "the roads were impassable", or that an "administrator refused to allow inspection." HCFA–At–77–106 (November 11, 1977); Record at 14, Ex. 2. HCFA interprets the exceptions as limited to extreme circumstances clearly beyond the State's control such as fire, floods and earthquakes. Record at 16, p. 5. The Secretary's gloss on the already restrictive regulations eviscerates the statutory exception and does violence to the legislative intent.

The Board also upheld the Secretary's notion that excusable factors must be outside the State's control. "Delaware refers its failure to conduct the medical reviews as 'inadvertent'. There is nothing to show that this failure was related to circumstances beyond the State's control. The circumstances here, rather than demonstrating 'good faith and due diligence,' as alleged by Delaware, are more appropriately considered with the types of 'disorderly record keeping' or staffing or scheduling problems which the agency explicitly stated

**26.** The language of the regulation and of the    statute is the same in all important respects.

would not place a State within this exception." Board Op. at 1. Even if the failure of Delaware to place the four unreviewed patients on a review list was due to disorderly record keeping, or staffing, the inquiry required by the State is a subjective one focusing on the intent of the State. Even if the Agency had staffing and record keeping problems, these problems were not so severe that they prevented the State from reviewing every patient in every facility except for four individuals. This indicates precisely the type of good faith envisioned by the statute. The fact that the State immediately reviewed the four unreviewed patients, and found that they were receiving adequate care, suggests due diligence and good faith. Record at 2, Attachment B.

The Board's interpretation contradicts the intent of the Legislature that good faith be a subjective inquiry:

> The conferees stress that the *intent* of the law that all facilities be reviewed is not changed by the provisions. If a facility is not reviewed, there will be a reduction in matching unless the Secretary finds there was a good faith attempt to review the institution, and there is no evidence that any institution, or kind or type of institution, is *deliberately* not reviewed. H.Rep. No. 95–673, 95th Cong., 1st Sess. 48 (1977), U.S.Code Cong. & Admin.News 1977, p. 3122.[27]

By focusing on the "intent" of the State and insisting that there be no evidence that a State "deliberately" failed to review a facility, Congress unequivocally intended to erect a subjective good faith standard. The regulations, the Secretary's interpretations and the Board's sanction of those interpretations artifically create an objective standard that violates the statute's intent.

There is no evidence on the record that any institution was deliberately not reviewed, or even that any patient was deliberately not reviewed. The Secretary's action, upheld by the Grant Appeals Board, in disallowing funds because four patients were not reviewed was certainly not reasonable and, in fact, was arbitrary and capricious.

### 4. The Board's Interpretation of The Technical Failings Standard is Arbitrary and Capricious

The Social Security Act also provides that a State can demonstrate compliance if it would have made a showing "but for failings of a technical nature only." 42 U.S.C. 1396b(g)(4)(B) (1982) (Supp.III 1985). The regulations reinterpret this directive to require that if a State cannot make a showing for "technical reasons" by the close of the quarter, it must comply fully within 30 days after the close of the quarter. "Technical reasons are circumstances within the agency's control." 42 C.F.R. 456.653 (1986).

The Secretary further restricts the definition of "technical reasons." HHS believes that the technical failing exception should be limited to "extraordinary circumstances" such as: "(1) incapacity/death of a review team member; (2) civil disorders; (3) destroyed or delayed access to significant records; and (4) strikes by state employees." Record at 16, p. 6.

This interpretation conflicts with the statute and its legislative history. The plain meaning of "technical" is "of or pertaining ... to practice method, procedure, etc...." Webster's New Collegiate Dictionary (2d ed. 1956). A technical failing, therefore, is a failing of procedure. None of the examples listed by HHS concern failings in procedure—rather, they involve unusual and bizarre occurrences.

---

**27.** *"Conference agreement.*—The conference agreement provides that good faith attempts to perform reviews of all institutions, and [sic] actually reviews all large institutions and 98 percent of all other institutions (or fails to meet this standard only for technical reasons), it will be considered in full compliance with the requirements of the law. The conferees stress that the intent of the law that *all* facilities be reviewed is not changed by this provision. If a facility is not reviewed, there will be a reduction in matching unless the Secretary finds there was a good faith attempt to review the institution, and there is no evidence that any institution, or kind or type of institution, is deliberately not reviewed". H.Rep. No. 95–673, 95th Cong., 1st Sess. 48 (1977), U.S. Code Cong. & Admin. News 1977, p. 3122.

The legislative history is silent as to what constitutes a technical failing; it only specifies that it "would include instances where a State had reviewed patients in most facilities on time with the remaining facilities also reviewed but not until several weeks after the deadline for completion of all reviews by a State." S.Rep. No. 95–453, 95th Cong., 1st Sess. 41 (1977). But this language suggests an emphasis on procedural irregularities rather than on major upheavals.

The Secretary's interpretation is supported by the Board's holding that "... we generally agree with the basic principle underlying the HCFA's position that technical failings are based on circumstances within a State's control, but that poor administration or bad record keeping should not be considered a technical failing." Board Op. at 18, Record at 1.

Under the Secretary's interpretation, upheld by the Board, the situation is this: a showing of good faith and due diligence can be made out when factors beyond the State's control prevent inspection—such factors include earthquakes, fires and floods. On the other hand, a showing of technical failure can only be made when factors within the State's control come into play. Such factors include: death, civil disorder, destroyed records or striking employees. How death can be within the control of a State while a fire is beyond the control of a State escapes this Court. How can it be that States can control civil disorders, but not floods? The Secretary's interpretation of the regulations and the statute is not simply unreasonable or arbitrary and capricious, but preposterous. The language of *Alice In Wonderland* is used to justify the procedures of *Catch 22*.

The purpose of the Secretary's regulatory interpretations is to create an effective program. But the program already is effective as judged by HHS' own utilization report. Record at 2. The Board's inference that the failure to review four patients was caused by "poor administration or bad record keeping" is not supported by anything in the record. Board's Op. at 18. This assertion is directly contradicted by the facts presented to this Court.[28] If anything constitutes a technical failing, the State's inability or oversight to review patients in this case qualifies. Mr. Schauber was omitted from the Medicaid coverage list because his coverage fluctuated from month to month—his name was not placed on the review list in time for the November 4, 1984 review. The other three names were omitted as a result of a transcription error attributable almost entirely to the fact that Delaware had a manual rather than a computerized record-keeping system. Record at 17, p. 15.

The Secretary's interpretation of the technical failing exception is not saved by any delegation of power. In *Schweiker v. Grey Panthers,* 453 U.S. 34, 101 S.Ct. 2633, 69 L.Ed.2d 460 (1981), the Secretary's interpretation of Medicaid "deeming" provisions was accorded deference because the statute specifically delegated the authority to develop income standards to the Secretary. But 42 U.S.C. § 1396b(g) (1982) does not specifically delegate to the Secretary responsibility to define good faith or technical failings. Although failings of a "technical nature must be demonstrated to the 'satisfaction' of the Secretary", this is not a broad delegation of power. *See Connecticut v. Schweiker,* 557 F.Supp. 1077, 1089 n. 28 (D.Conn.1983), *rev'd.,* 731 F.2d 1052, *aff'd.,* 471 U.S. 524, 105 S.Ct. 2210, 85 L.Ed.2d 577 (there is no deference to an agency interpretation when there is no explicit delegation to the Secretary to define

---

**28.** The Secretary's interpretation of the technical failing exception is arbitrary because it could lead to the absurd result of having a State fail to comply before it was even aware of a violation. The Secretary suggests that a review is timely "if it is conducted by the end of the anniversary quarter of the facility's entry into the program or of the first prior review." On this interpretation, the review for the first quarter of 1984 did not have to be completed until March 31, 1984. The patients were actually reviewed several weeks later in August, 1984. The Secretary's interpretation would have a State fail to comply due to a technical violation before the violation is apparent to the State agency. *See South Dakota Department of Social Services,* Dep. Grant Appeals Bd. No. 85–10, Slip Op. 7 (1985) (final admin. review). (In certain circumstances, a State may fail to review a patient for up to 15 months without incurring a penalty).

requirements). Rather, the Secretary's interpretation of technical failings completely contradicts the language and the underlying purpose of the statute. This contradiction renders the interpretation invalid. *Yuckert v. Heckler*, 774 F.2d 1365, 1369 (9th Cir.1985). *See also Regents of Univ. of Calif. v. Heckler*, 771 F.2d 1182, 1187 (9th Cir.1985).

Under the standard of review constructed in *Lugo v. Schweiker*, 776 F.2d 1143 (3d Cir.1985), the Secretary's interpretations of the statute and regulations must fail. In *Lugo*, the Third Circuit found that "because Congress decided not to describe explicitly the method of computing erroneous payments, we must defer to the Secretary's interpretations so long as it is reasonable." *Id.* at 1147. *See Weyerhauser Co. v. Costle*, 590 F.2d 1011, 1027 (D.C.Cir.1978) (courts are better than agencies in making judgment about common sense terms found in a statute or in a legislative history). The Secretary's interpretation of the technical failings exception is in no sense reasonable. *See also Malloy v. Eichler*, 628 F.Supp. 582, 593 (D.Del.1986) (in interpreting an action transmittal letter, the "Secretary's words are not entitled to legislative effect and her interpretation must be subjected to more intense scrutiny than that applied under the arbitrary and capricious standards."). As the discussion above illustrates, the Secretary's actions are not only unreasonable, they are also arbitrary and capricious.

Having decided that the regulations, the Secretary's interpretation, and the Department's Appeals Board's decision run afoul of the Medicaid statute, there is no need to reach the Fifth Amendment due process questions raised by Delaware. Whenever possible, cases should be decided on statutory, rather than constitutional, grounds. *See, e.g., Califano v. Yamasaki*, 442 U.S. 682, 692, 99 S.Ct. 2545, 2553, 61 L.Ed.2d 176 (1979); *Lugo v. Schweiker*, 776 F.2d 1143, 1151.

## CONCLUSION

HHS regulations interpretating the "conducted review" requirement of the Social Security Act are arbitrary and capricious and must be overturned. Similarly, the regulation defining a "good faith" exception to the requirement that States inspect their federally funded nursing homes must also be struck down. HHS regulations providing for a technical failing exception to the inspection requirement is not arbitrary and capricious on its face. Finally, the Court concludes that the Secretary's interpretations of the regulations and statute—including the "good faith" and "technical failing" exceptions—were arbitrary and capricious and must be overturned.

Accordingly, HHS is ordered to immediately return any disallowance penalty assessed to Delaware. HHS is also permanently enjoined from enforcing the invalidated regulations and interpretations against the State of Delaware. The Grant Appeals Board decision is reversed except for that portion of the Opinion which held that HHS improperly assessed a disallowance penalty for the fiscal quarter ending September, 1984.

An Order will enter in conformity with this Opinion.